**Norman D. PAUL, Plaintiff,**

v.

**GENESEE & WYOMING INDUSTRIES, INC., Genesee & Wyoming Railroad Company, and Rochester & Southern Railroad, Inc., Defendants.**

**No. 98–CV–0331C(H).**

United States District Court, W.D. New York.

March 29, 2000.

DiNardo, DiNardo & Lukasik, P.C. (Daniel R. Metschl, of counsel), Buffalo, NY, for plaintiff.

Harter, Secrest & Emery, LLP (John C. Herbert, of counsel), Rochester, NY, for defendants.

## DECISION AND ORDER

CURTIN, District Judge.

### INTRODUCTION

Pursuant to the Federal Employers Liability Act ("the FELA"), 45 U.S.C. § 51 *et*

*seq.*, and the Federal Safety Appliances Act ("FSAA"), 49 U.S.C. § 20301 *et seq.*, plaintiff Norman Paul ("Paul") commenced this action in May of 1998 against Genesee & Wyoming Industries, Inc. ("G & W Industries"),[1] Genesee & Wyoming Railroad Company, Inc. ("G & W Railroad"), and Rochester & Southern Railroad, Inc. ("R & S Railroad") (collectively "the defendants"). In July of 1999, Paul moved for summary judgment on the issue of liability and also moved to strike the affirmative defense of contributory negligence. Item 11. In August of 1999, the defendants cross-moved for summary judgment on the issue of liability. Item 13. Paul has had an opportunity to reply to the defendants' cross-motion. Item 17. The court has considered the parties' arguments carefully and now proceeds to a decision.

## FACTS

### I. Undisputed Facts

The parties have both moved for summary judgment and have both submitted statements of undisputed material fact. *See* Items 11 and 14. In submitting these competing fact statements, however, the parties have neither admitted nor denied the factual statements of the other party. Nevertheless, the court has been able to identify a number of facts that are not in dispute.

### A. The Accident

R & S Railroad hired Paul as a car man in 1989. As a car man, it was Paul's duty to inspect railcars and to perform "yard" and "track" repairs of railroad cars. *See* Item 13, Exh. A to Affidavit of Donald Ball. Paul fell and injured himself on June 29, 1995, while he was inspecting a railcar in the Brooks Avenue Yard in Rochester, New York. *See* Item 13, Exh. A, pp. 34–35. At the time of the accident, Paul was working alone. There were no witnesses to the accident besides Paul.

According to Paul, he was inspecting the "grab irons" on a railcar at the time of the accident. Grab irons extend up the sides and along the top edges of most railcars, with the grab irons on the side forming a kind of ladder. Moments prior to the accident, Paul had visually inspected the grab irons on the side of the railcar and had seen no visible defects. Paul then climbed "the ladder" so that he could inspect the grab irons along the top edge of the railcar. As he reached the top of the ladder, Paul tried to pull himself up on top of the railcar by holding onto a grab iron on the railcar's top edge. Paul grasped the grab iron with his right hand and pulled on it to make sure that it was secure. Paul then tried to grasp the grab iron with his left hand as well. At that point, the grab iron broke loose from its moorings. When the grab iron broke loose, Paul lost his grip and fell. As he fell to the ground, Paul stopped his fall by catching hold of the side of the railcar. By preventing his fall in this way, Paul claims that he sustained serious injuries to his neck, shoulder, and arm. *See* Item 13, Exh. A, pp. 37–45.

### B. Dismissing Certain Defendants

The defendants maintain that G & W Industries and G & W Railroad are not proper parties to this action. For his part, Paul admits that he was an employee of only R & S Railroad at the time of the accident. The defendants assert that G & W Industries is the holding company of both R & S Railroad and G & W Railroad. *See* Item 13, ¶ 3. The defendants also insist that R & S Railroad, G & W Industries, and G & W Railroad "are all separate corporations," Item 14, and that, as a result, the court should dismiss the complaint against G & W Industries and G & W Railroad. *See* Item 15, p. 9; *see also* Item 13, Exh. B, pp. 57–58 (containing description of defendants' corporate relationships).

1. Now known as "Genesee & Wyoming, Inc."

Paul has not disputed these statements of fact, nor has he disputed the defendants' argument that the only proper defendant in this action is Paul's employer, R & S Railroad.

## II. Disputed Facts

In the present motion and cross-motion, a key legal issue is whether the railcar and the rest of the train ("the railcar and train") were "in use" at the time of the accident. *See infra.* As such, the parties urge the court to consider different sets of facts when assessing whether the railcar and train were in use.

Paul states that just prior to the accident, he had been assigned "to inspect an *outbound* train" that was situated on track eleven of Brooks Avenue Yard. Item 13, Exh. A, pp. 26–29 (emphasis added). Paul claims that track eleven was "[a]s a rule ... designated ... for an outbound train." *Id.* at 30. Paul also asserts that a "Record of Repair" from the day of accident shows that the train he was inspecting was loaded and ready for departure. *See* Item 11, Exh. C. Similarly, Paul alleges that the railcar "was loaded with clay ... to be delivered to Lapp Insulation." Item 11, Exh. B. Paul argues that these facts show that the railcar and train from which he fell were both "in use" at the time of the accident.

The defendants counter that the railcar and train were not in use. First, the defendants assert that Paul was injured while inspecting a train that was on an *assembly* track, not an outgoing track. Item 14. The defendants maintain that Paul has admitted that he was inspecting a train on an assembly track:

Q: Is track number eleven designated for any specific purpose?

A: As a rule it's designated to *build your train up* on for an outbound train.

Q: ... How do you *make a train up* or *build* a train?

A: Train crew brings the cars from customers or interchange and they place the cars on track eleven for an outbound train.

Item 13, Exh. A, pp. 27–28 (emphasis added). In addition, the defendants point out that the train had been "blue flagged"[2] for inspection. *Id.* at 32–33. Paul has admitted that the train was blue-flagged and that it was in the process of being "built." The defendants argue that this is proof that the train was not "in use." *See* Item 13, Affidavit of Donald Ball, ¶ 8.

The defendants also place a great deal of stock in the fact that Paul was not a member of a "train crew" and therefore was never involved in the actual movement of trains. *See id.* ¶ 9. "[Paul's] duties all involved work on the trains *after* they arrived in the yard *or before* they departed from the yard." *Id.* To this effect, the defendants state that the railcar and train had been in the yard for almost two full days since the last line movement, *see* Item 13, Affidavit of Donald Ball, ¶ 6, and that the train itself was probably not scheduled to depart until the late evening—long after the completion of Paul's shift. *See id.* ¶ 11. Finally, the defendants note that there were no engines on the train that Paul was inspecting. *See* Item 13, Exh. A, p. 33. In sum, the defendants argue that the facts in this case demonstrate that the railcar and train were not in use at the time that Paul was inspecting them.

## DISCUSSION

There are three issues to be resolved in this motion and cross-motion for summary judgment: (1) whether the court should dismiss defendants G & W Industries and

---

**2.** "Blue flagged" is a phrase used throughout the railroad industry. "The blue signal—usually a blue flag in daylight or a blue light at night—protects employees who might be vulnerable to the movement of the cars by warn-ing other crews not to move trains around a work area." *Morant v. Long Island R.R.,* 66 F.3d 518, 520 (2d Cir.1995); *see also* 49 C.F.R. § 218.23 (1999).

G & W Railroad; (2) whether under the FSAA, the railcar and train were "in use" at the time Paul was inspecting them; and (3) whether under the FELA, Paul has made out a *prima facie* claim of negligence against the defendants. *See* Item13, pp. 1–2 (identifying these issues).

## I. Dismissal of Certain Defendants

■ As a rule, parent corporations are not liable for the debts or actions of their subsidiaries. *See, e.g.,* 18A *Am.Jur.2d* Corp. § 856.

> [T]he ownership of all or the majority of the stock of one corporation by another corporation does not destroy the identity of the former as a distinct legal entity, and, in the absence of a statute providing to the contrary, the mere fact of the ownership of a majority or all the stock of its subsidiary does not render the parent corporation liable [for the actions] ... of the subsidiary.

*Id.* (footnotes omitted).

■ In this case, the record clearly demonstrates that, at the time of the accident: (1) defendant G & W Industries was the parent corporation of both defendants R & S Railroad and G & W Railroad; (2) Paul's employer was R & S Railroad; (3) R & S Railroad and G & W Railroad have no connection outside of the fact that both were subsidiaries of G & W Industries; (4) neither G & W Industries nor G & W Railroad owned or operated any of the railcars in the train that Paul was inspecting; and (5) R & S Railroad was the only defendant that operated from the Brooks Avenue Yard, which is where the accident occurred. *See* Item 13, Affidavit of Donald Ball, ¶ 2.

In light of the foregoing, the court finds that there is no evidence in the record to indicate that G & W Industries or G & W Railroad could be held liable for the alleg-

edly tortious acts of R & S Railroad. Therefore, the court dismisses G & W Industries and G & W Railroad as defendants.

## II. Railcar and Train: "In Use"

■ As a threshold matter, it is important to observe that railroad employers are generally held strictly liable for injuries to employees that arise out of violations of the FSAA. *See infra.* In this case, Paul alleges that R & S Railroad's violation of the FSAA caused the accident. *See* 49 U.S.C.A. § 20302(a)(1)(C) (West 1997).[3] In relevant part, section 20302(a)(1)(C) of the Act requires that: "a railroad carrier may use or allow to be used on any of its railroad lines—a vehicle only if it is equipped with ... secure handholds or grab irons on its roof at the top of each ladder ...." *Id.*

■ While the FSAA does not create an independent cause of action for plaintiffs who are injured because of a violation of the Act, "the cause of action created by the Federal Employers' Liability Act ... embraces claims of an employee based on violations of the Safety Appliance Act." *Crane v. Cedar Rapids & Iowa City Ry. Co.*, 395 U.S. 164, 166, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969). Again, a plaintiff who proves that a defendant railroad violated the FSAA need not show that the railroad was negligent because railroads are held strictly liable under the FELA for injuries that are caused by a violation of the FSAA. *See Illinois Cent. Gulf R.R. Co. v. International Paper Co.*, 889 F.2d 536, 537 n. 1 (5th Cir.1989).

■ "However, the FSAA's requirements apply to only railcars that are actually 'in use.'" *Phillips v. CSX Transp., Inc.*, 190 F.3d 285 (4th Cir.1999) (quoting *Brady v. Terminal R Ass'n of St Louis*,

**3.** The FSAA was formerly codified in scattered sections of 45 U.S.C. §§ 1–43a (1994). The legislative history of the FSAA's recodification indicates that Congress did not intend to make substantive changes to the FSAA when it recodified it in 1994. *See* S.Rep. No. 103–265, at 5 (1994) ("[T]his bill [does not] make ... substantive change in the law.") Thus, cases that analyzed the FSAA prior to 1994 apply to this case with equal force.

303 U.S. 10, 13, 58 S.Ct. 426, 82 L.Ed. 614 (1938)). Whether a locomotive is "in use" is a question of law for the trial court to decide and not a question of fact for the jury. *See Crockett v. Long Island R.R.*, 65 F.3d 274, 277 (2d Cir.1995) (addressing issue of "in use" under the Boiler Inspection Act).[4] Therefore, summary judgment provides the proper forum for a court to decide whether a train was in use at the time of an accident.

The inquiry into whether a train was "in use" under the FSAA is neither simple nor straightforward. *See Deans v. CSX Transp.*, 152 F.3d 326, 329 (4th Cir.1998) (calling "in use" inquiry "anything but clear"). The inquiry is challenging because precedent on the issue tends to be very fact-specific, *see Trinidad v. Southern Pac. Transp. Co.*, 949 F.2d 187, 189 (5th Cir.1991) ("Like many courts before us that have examined this statute, we are without precedents of any clear and controlling effectiveness." (citation and quotation omitted)), and because there are generally no bright lines that demarcate when a train is in use and when it is not. *See Deans*, 152 F.3d at 329 (calling bright-line distinctions "too facile" to be of use).

■ In *Deans* and *Phillips*, the Fourth Circuit set forth certain factors that a court should look to in determining whether a train was in use: "[T]o determine whether a train is 'in use' for purposes of the FSAA, the primary factors ... are where the train was located at the time of the accident and the activity of the injured party." *Deans*, 152 F.3d at 329.

■ In this case, the railcar and train that Paul was inspecting were located on a track that was being used to assemble or "make up" the train. Further, the train was blue-flagged and the track was locked-out. While the railcar and train were not in the Brooks Avenue Yard's "roundhouse"

or maintenance garage, the yard staff had definitely set them aside for assembly and a pre-departure inspection.

The railcar and train's location at the time of the accident tend to show that they were not in use. The train was blue-flagged and located on a locked-out track that was designated for assembling trains rather than operating them. When a train is blue-flagged, no one may move it, and no movement may take place on that track until the person who locked the track unlocks it. *See* 49 C.F.R. § 218.23(a), (b) (1999) (providing that when "blue signals" are displayed "[o]ther rolling equipment may not be placed on the same track" and that such signals "may only be removed by the same craft or group that displayed them"). Paul has stated that track eleven was an "outbound" track. However, the record indicates that, at the time of the accident, track eleven was actually an assembly track. Thus, the location of the train points to the fact that the train was not in use at the time of the accident.

As for Paul's activity at the time of the accident, he has testified that he was performing a pre-departure inspection of the train. Specifically, Paul has testified that he inspected "the brake shoes ... wheels to make sure they are of the right gauge, ... [the] brake pistons, side ladders, hand grabs, sill steps, draw heads." Item 13, Exh. A, p. 31. Paul characterized the work he was performing as an "initial inspection" and stated that once he was done he would "unlock the switch [on the track], ... take [the] blue flag down, ... [and] tell the yardmaster these cars are ready to go. When the train crew is ready they would place X number of engines on that track of cars." *Id.* at 33. In addition, Paul was not a member of a train crew, and his inspection would not have been incidental to his operation of the train.

4. It is appropriate for courts to rely on cases decided under the Boiler Inspection Act, 49 U.S.C.A. §§ 20102, 20701 to 20703, 21302, 21304 (West 1997), in order to resolve whether a train was "in use" under the FSAA. *See*

*Holfester v. Long Island R.R. Co.*, 360 F.2d 369, 373 (2d Cir.1966); *Steer v. Burlington Northern, Inc.*, 720 F.2d 975, 976 n. 3 (8th Cir.1983).

With respect to Paul's activity at the time of the accident: "[T]he purpose of the 'in use' limitation is to give railcar operators the opportunity to inspect for and correct safety appliance defects before the FSAA exposes the operators to strict liability for such defects." *Phillips*, 190 F.3d at 288 (citing *Angell v. Chesapeake and Ohio Ry. Co.*, 618 F.2d 260, 262 (4th Cir.1980) ("[The Boiler Inspection Act] exclude[s] from its coverage only such functions as are necessary to detect and correct those defective conditions for which absolute liability will be imposed.")). In this case, Paul was inspecting the train so that it could be cleared for departure. Paul has testified that it was his job to check over each railcar on a train so that the yard master could then notify the train crew that the train was ready to depart. *Phillips* reveals that trains are not in use during such pre-departure inspection activity.

In support of his position that the railcar and train were in use, Paul relies on cases like *Angell*, 618 F.2d 260; *Deans*, 152 F.3d 326; and *Holfester v. Long Island R.R. Co.*, 360 F.2d 369 (2d Cir.1966). Paul's reliance on these cases is misplaced.

With respect to *Angell*, the court finds that the train involved in that case was significantly different from the one here. "[A]ll servicing, maintenance and inspection work had already been performed and the engine was being moved to its place in the consist [at the time of the plaintiff's injury]." *Angell*, 618 F.2d at 261. The present case differs significantly from *Angell*. Here, the inspection had not been completed at the time of Paul's accident. Furthermore, no one at the rail yard had started to join engines to the train at the time of the accident.

The court also finds that the train in *Holfester* differed significantly from the railcar and train in this action. In *Holfester*, the plaintiff was injured while working on a train that had been pulled off the main line for a quick "between-run" inspection. 360 F.2d at 372. In all, the train in that case was scheduled for a mere three-hour layover. In this case, by contrast, the railcar and train that Paul was inspecting had been in Brook's Yard for at least two days, and had an undetermined time of departure.

Furthermore, the Fourth Circuit's decision in *Deans* weighs against Paul, despite the fact Paul relies on that case in his papers. In *Deans*, the court reasoned that the train was in use because it "had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure . . . ." 152 F.3d at 329. In this case, Paul himself has testified that there were no engines on the train and that the transportation crew would have attached engines only after he notified the yard master that his inspection was complete. Item 13, Exh. A, pp. 32–33. Furthermore, while Paul asserts that the railcar he was inspecting was filled with industrial material that was ready for delivery, he also admitted that the train he was inspecting might have left "that [same] day, the next day or whenever they're ready to take it out." *Id.* at 33. Meanwhile, R & S Railroad has submitted proof that the train probably did not leave until several hours after Paul's accident:

> We do not have any record showing when the . . . train in question was scheduled to leave the Brooks Avenue Yard, but typically at that time, a train being inspected by Mr. Paul would leave the yard outbound at 10:00 or 11:00 P.M. of that day. The train would not have been close to imminent departure when Mr. Paul was performing his inspection. . . . Mr. Paul's shift would normally have ended at 3:30 p.m., about 6 hours before the train would normally depart.

Item 13, Affidavit of Donald Ball, ¶ 11. The train in this case, then, differs significantly from the train in *Deans*. The differences between *Deans* and this case further demonstrate that the railcar and train were not in use at the time of the accident.

Under the Fourth Circuit's rulings in *Deans* and *Phillips* and in light of the foregoing discussion, the court concludes that the railcar and train were not in use at the time of Paul's accident. In light of this finding, Paul is not entitled to rely on the FSAA. Thus, R & S Railroad cannot be held strictly liable for injuries that were allegedly caused by a violation of the FSAA.

### III. The FELA Claim

■ Without the benefit of the FSAA, Paul must survive R & S Railroad's motion for summary judgment by asserting a *prima facie* claim of negligence. "[I]n the Second Circuit, an employer breaches its duty under FELA if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir.1999) (citation and quotation omitted). This duty to provide a reasonably safe workplace includes both a duty to maintain and inspect work areas, *see Grano v. Long Island R.R. Co.*, 818 F.Supp. 613, 617 (S.D.N.Y.1993), and a duty to inspect railcars belonging to another railroad before permitting employees to work with them, *see Shenker v. Baltimore and Ohio R.R. Co.*, 374 U.S. 1, 8, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963).[5]

■ There is a considerably relaxed standard of proof for determining negligence in FELA cases, *see Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), as well as a strong federal policy in favor of letting the trier of fact decide these cases. *See O'Hara v. Long Island R.R.*, 665 F.2d 8, 9

(2d Cir.1981). Thus, "[u]nder the FELA, the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff." *Gadsden v. Port Authority Trans–Hudson Corp.*, 140 F.3d 207, 209 (2d Cir.1998).

■ Yet, plaintiffs who sue under the FELA still must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation. *See Grano*, 818 F.Supp. at 617. Here, R & S Railroad claims that Paul has failed to show that the alleged defects in the grab iron were in any way foreseeable. Paul maintains that the record contains sufficient evidence to support an inference of foreseeability.

■ The issue of notice typically presents a question of fact. As with all factual issues under FELA, "the right of the jury to pass on this issue must be liberally construed." *Herbert v. National R.R. Passenger Corp.*, 1995 WL 507289, at *3 (S.D.N.Y. Aug.28, 1995) (quoting *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 85 (2d Cir.1989)). Indeed, "the concept of foreseeability has been construed somewhat more liberally in FELA cases than it might otherwise be under common law." *Ulfik v. Metro–North Commuter R.R.*, 77 F.3d 54, 58 n. 1 (2d Cir.1996).

■ With respect to reasonable foreseeability in FELA actions, the essential element is actual or constructive notice to the employer of the defective condition that caused the injury. *See Sinclair v. Long Island R.R.*, 985 F.2d 74, 77 (2d Cir.1993). In this case, thus far, there is absolutely no indication that R & S Railroad had actual notice of the defective

---

5. Furthermore, the Court in *Shenker* found that the defendant Railroad company, B & O Railroad, was not absolved of responsibility for its employee's injury simply because the injury occurred on a railcar belonging to a different company, P E Railroad: "Nor is it an answer to claim that the B & O lacked control over or supervision over the P E car. Such arguments have never supported an ex-

ception to the employer's duty to provide a safe place to work, and have no greater relevance here with respect to the duty to provide reasonably safe [rail]cars." 374 U.S. at 9, 83 S.Ct. 1667. Thus, the fact that the railcar did not belong to R & S Railroad does not preclude a finding that R & S Railroad was negligent in failing to discover the allegedly defective grab iron.

grab iron. Therefore, the issue is whether the record may support a reasonable inference that R & S Railroad had constructive notice of the defective grab iron.

R & S Railroad maintains that there is "not even the slightest evidence of ... foreseeability of this defective condition ...." Item 15, p. 8. First, R & S Railroad states that it could not have reasonably foreseen the defective grab iron because R & S Railroad did not own the railcar. However, the Supreme Court has ruled that railroad employers have a duty to inspect railcars from other railroad companies for defects before allowing their own employees to work on them. *See Shenker,* 374 U.S. at 8–9, 83 S.Ct. 1667. Under *Shenker,* then, this argument from R & S Railroad does not carry the day. *See supra.*

Next, R & S Railroad asserts that it would have been impossible for it to "observe or discover the [defective] condition." Item 15, p. 8. Paul himself speculated at his deposition that it would have been very difficult to detect the defective grab iron by a visual inspection. Item 13, Exh. A, p. 47. Furthermore, Paul did not detect the defect in the grab iron prior to the accident despite the fact that he tugged on it with his right hand in order to check its stability. *See id.* at 40–41.

However, Paul argues that the grab iron's defect was not latent or undiscoverable. Paul insists that his testimony has raised an issue of fact as to whether the defect should have been detected prior to the accident.

Q: When you say [that the grab iron] ripped out, what do you mean ... ?
A: The hand grab, the bolt, the nut, it all ripped out of the crossover board.
. . . .
Q: Which side pulled out?
A: As I'm facing it, the right side.
Q: And how far did it pull?
A: It pulled right up out of the car.

Item 13, Exh. A, p. 42. Here, the court observes that the railcar was at the Brooks Avenue Yard for almost two days before the accident occurred. *See* Item 13, Affidavit of Donald Ball, ¶ 6.

In light of the fact that the grab iron broke in such dramatic fashion, Paul argues that the grab iron's defect was one that should have been detected by R & S Railroad before he ever worked on the railcar. Paul maintains that the jury should determine "[w]hether a visual inspection would have revealed such a defect ...." Item 17, p. 11.

In order to resolve this question, the court looks to the Second Circuit's decision in *Sinclair,* 985 F.2d 74, for guidance. In *Sinclair,* the plaintiff sought to show his employer's constructive notice of a hazard in his workplace by introducing photographs of the accident scene. The court of appeals assessed the photographs and found that a reasonable jury could have looked at these photographs and found that the employer should have discovered the hazardous condition prior to the plaintiff's injury. In ruling, the Second Circuit recognized that railroad employers may be charged with constructive notice of a defective condition on a "failure to inspect" theory. *Id.* at 77. Specifically, the court noted that a jury could impute constructive notice to a railroad employer where the defective condition could have reasonably been discovered, but was not discovered due to the railroad's failure to inspect the relevant work area. "[T]he Railroad might have been liable on the ground that it had a non-delegable duty to inspect, regardless of notice ...." *Id.*

Relying on the strong federal policy in favor of letting a jury decide issues of negligence under the FELA, the court of appeals found that the district court had erred by taking the issue of notice away from the jury. "[E]xactly what the [defendant] knew or should have known, and whether the [defendant] exercised reasonable care in light of its knowledge, are questions of fact upon which reasonable

jurors could differ." *Id.* at 77 (quoting *Gallose,* 878 F.2d at 86).

 Under cases like *Sinclair* and *Gallose,* this court finds that there are issues of fact as to whether R & S Railroad may be charged with constructive notice of the allegedly defective grab iron. Rather than rely on photographs of the accident scene, as the plaintiff did in *Sinclair,* Paul relies on his own testimony regarding how the grab iron broke loose of its moorings when he grabbed onto it. Paul contends that his testimony reasonably gives rise to the inference that R & S Railroad should have discovered such a defective grab iron before the accident. Much like the court of appeals in *Sinclair,* this court finds that a reasonable jury could credit Paul's description of how the grab iron broke loose from its moorings, and conclude that, given almost two full days during which to inspect the railcar, a reasonably prudent railroad employer should have discovered such a defective grab iron before the accident occurred.

In light of the facts and holding in *Sinclair,* the relaxed standard of proof in FELA actions, and the strong federal policy in favor of letting the trier of fact decide these cases, the court finds that there are questions of fact, slight though they may be, regarding whether R & S Railroad had constructive notice of the defective grab iron. As such, the court holds that a jury should determine whether R & S Railroad was negligent in failing to provide Paul with a reasonably safe workplace, and, if so, whether such negligence caused Paul's injuries.

## IV. Paul's Motion to Strike Affirmative Defenses

The court has already held that Paul cannot state a claim based on alleged FSAA violations. As a result, the court denies Paul's motion to strike R & S Railroad's affirmative defense based on his alleged contributory negligence. Plaintiffs who assert valid tort claims under the FSAA are not subject to affirmative defenses based on contributory negligence. However, plaintiffs, like Paul, who assert ordinary negligence claims under the FELA, *are* subject to affirmative defenses like contributory negligence. *See* 45 U.S.C. § 53 (1994).

## CONCLUSION

In light of the foregoing, the court: (1) denies Paul's motion for summary judgment in its entirety (Item 11); (2) grants the defendants' cross-motion for summary judgment to the extent that they request the dismissal of defendants G & W Industries (now known as Genesee & Wyoming, Inc.) and G & W Railroad (Item 13); (3) grants defendant R & S Railroad's cross-motion for summary judgment to the extent that Paul's claim is based on the FSAA (Item 13); (4) denies Paul's motion to strike the affirmative defense of contributory negligence (Item 11); and (5) denies defendant R & S Railroad's cross-motion for summary judgment to the extent that Paul's claim is based on negligence under the FELA (Item 13).

A telephone conference shall be held in this case on Thursday, April 13, 2000, at 11 a.m. to set a further schedule.

So ordered.