**PORT TERMINAL RAILROAD ASSOCIATION, Appellant,**

v.

**Michael JONES, Appellee.**

No. 04–01–00042–CV.

Court of Appeals of Texas, San Antonio.

May 8, 2002.

Rehearing Overruled May 29, 2002.

Gordon A. Holloway, Kyle M. Rowley, Holloway & Rowley, P.C., Houston, for Appellant.

George Payne, Tom R. Letbetter, Garrett, Letbetter & Payne, Houston, for Appellee.

Daniel Saphire (ADL), Louis P. Warchot, Ass'n of American RR's, Washington, DC, for Appellee.

James L. Walker (ADL), Leo D. Figueroa, Jackson Walker, L.L.P., San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice.

Opinion by SARAH B. DUNCAN, Justice.

Port Terminal Railroad Association appeals the judgment in favor of Michael Jones in his suit under the Federal Employer's Liability Act for violations of the Safety Appliance Act. We hold there is no evidence of a precondition of liability—that the train was "in use" at the time of the accident—and therefore reverse the trial court's judgment and render judgment in the PTRA's favor.

### FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of the accident, Michael Jones, a railroad switchman for PTRA, was assigned to drop off a string or "cut" of railroad cars at three facilities (Lubrizol, Grace, and Diamond Deer Park), pick up each facility's loaded cars, and take the cars to the Pasadena Yard, where they would be coupled with other cars and an engine to form a train. Before Jones could pick up a cut of cars, however, he had to release the hand brake on each car, visually inspect the safety appliances (steps, handholds, and rails), lace or "cut in" the compressed air supply lines, perform an air brake test, and couple his engine to the cars.

Jones first went to Lubrizol, working first on the car furthest from where the engine would be coupled. When he was approximately half way through the cut, he fell from the brake platform of a railcar when the handhold broke. At that point, the engine had not been coupled to the cars, nor had an air brake test been performed. These steps were not performed

until Jones and his crew first dropped off the cars at the other two facilities, performed the same predeparture procedures on their "outbound" rail cars, and returned with those cars to pick up the "outbound" cars at Lubrizol.

After the accident, Jones sued PTRA for negligence and violations of the Safety Appliance Act. The jury found that the broken handhold, but not negligence, was a proximate cause of Jones' injuries. The trial court rendered judgment on the verdict, after first ruling that the train was "in use" at the time of the accident.

### STANDARD OF REVIEW

■ Because the material facts are undisputed, whether the train car was "in use" at the time of the accident is a question of law. *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 329 (4th Cir.1998). We review questions of law *de novo*. *See Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 437 (Tex.1997); *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 820 (Tex.App.-San Antonio 1996, no writ).

### DISCUSSION

■ "The Safety Appliance Act imposes strict liability on railroads for violations of the Act's safety standards." *Trinidad v. S. Pac. Transp. Co.*, 949 F.2d 187, 188 (5th Cir.1991). However, strict liability does not attach unless the train is "in use" at the time of the accident. *See Brady v. Terminal R.R. Assn.*, 303 U.S. 10, 13, 58 S.Ct. 426, 82 L.Ed. 614 (1938). To determine whether a train is "in use," the federal circuit courts have developed competing tests. For instance, in *Trinidad*, the Fifth Circuit held the train was not "in use" when "it had not been released following inspection because the inspection was not yet complete." *Trinidad*, 949 F.2d at 189. This "bright line" test was rejected as "too facile" by the Fourth Circuit. *Deans*, 152 F.3d at 329. Instead, "to determine whether a train is 'in use' for purposes of the FSAA, the primary factors [the Fourth Circuit] consider[s] are where the train was located at the time of the accident and the activity of the injured party." *Id.; see McGrath v. Consol. Rail Corp.*, 136 F.3d 838, 842 (1st Cir.1998). In *Deans*, a conductor was injured while attempting to release a stuck hand brake and before conducting a predeparture air brake test. *Deans*, 152 F.3d at 328. The court held the train was "in use" because "it already had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure"; the injured conductor "was part of the transportation crew and in no way involved in the repair or maintenance of the train." *Id.* at 330. That the predeparture air brake test had not yet been conducted was of no practical significance since it could have been performed before the hand brakes were released. *Id.*

■ PTRA contends that both tests mandate reversal and rendition of judgment in its favor in light of the facts adduced at trial. We agree. Under the "bright line" test adopted by the Fifth Circuit, the Safety Appliance Act clearly does not apply. Jones's testimony establishes his predeparture inspection of the Lubrizol cars was not complete at the time of the accident. The Fourth Circuit's test leads to the same result. Jones's testimony establishes the cars were not in the yard, but on the Lubrizol lead; his predeparture inspection of the cars had not been completed; the engine had not yet been coupled to the cars; and the air brake test had not yet been performed. Indeed, neither of the latter two steps would be accomplished for a number of hours. In short, the departure of the cars was far from "imminent." *See Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 289–90 (4th

Cir.1999) (holding train was not in use, even though train was assembled and sitting in the yard, in part because "the train was about to be uncoupled from its engine, its handbrakes were being engaged, and it had yet to undergo its predeparture inspection"), *cert. denied,* 529 U.S. 1004, 120 S.Ct. 1269, 146 L.Ed.2d 218 (2000). We therefore hold the train was not "in use" when Jones's accident occurred.

### CONCLUSION

Because the train was not "in use" when Jones's accident occurred, regardless of whether we employ the Fifth or Fourth Circuit's test for "in use," the Safety Appliance Act does not apply. Consequently, we reverse the trial court's judgment and render judgment in favor of Port Terminal Railway Association.

Dissenting opinion by PHIL HARDBERGER, Chief Justice.

PHIL HARDBERGER, Chief Justice, dissenting.

The majority reverses the trial court's judgment based on its conclusion that the train was not "in use" when Jones was injured. I respectfully dissent.

In 1908, Congress enacted the Federal Employers' Liability Act ("FELA") in response to the physical dangers railroad workers faced that resulted in the death or maiming of thousands of workers each year. *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). FELA was intended to provide a federal remedy that "shifted part of the 'human overhead' of doing business from employees to their employers." *Id.* "[G]eneral congressional intent was to provide liberal recovery for injured workers." *Kernan v. American Dredging Co.,* 355 U.S. 426, 432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). To further this humanitarian purpose and Congress's remedial goal, the

United States Supreme Court has liberally construed FELA. *Gottshall,* 512 U.S. at 543, 114 S.Ct. 2396.

A railroad is strictly liable under FELA for violations of the Safety Appliance Act ("SAA"). *Houston Lighting & Power Co. v. Atchison, Topeka, & Santa Fe Ry. Co.,* 890 S.W.2d 455, 457 (Tex.1994). The SAA provides that "a railroad carrier may use or allow to be used on any of its railroad lines a vehicle only if it is equipped with . . . secure handholds or grab irons." 49 U.S.C. § 20302(a). A railcar is a vehicle. 49 U.S.C. § 20301(a). Accordingly, a violation of the SAA occurs if a carrier allows a railcar that is not equipped with secure handholds to be used.

The stated purpose of the "in use" limitation is to give railroads the opportunity to inspect for and correct safety appliance defects before being exposed to the SAA's strict liability for such defects. *Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 288 (4th Cir.1999). In keeping with this purpose, whether the railroad has completed its inspection is a critical factor in determining whether a railcar is in use. *See, e.g., Angell v. Chesapeake & Ohio Ry. Co.,* 618 F.2d 260, 261 (4th Cir.1980) (car in use when all servicing, maintenance, and inspection work had been completed and injury occurred post-inspection during coupling process); *Monongahela Ry. Co. v. Black,* 235 F.2d 406, 408 (4th Cir.1956) (car in use when moved to side track for loading); *Baltimore & O.R. Co. v. Tittle,* 4 F.2d 818, 819 (6th Cir.1925) (car in use when being prepared for coupling). In other cases involving a train arriving at a particular location, the critical factor is whether the train was withdrawn from service which would give the railroad a new opportunity to inspect the train. *See, e.g., Brady v. Terminal R. Ass'n,* 303 U.S. 10, 13, 58 S.Ct. 426, 82 L.Ed. 614 (1938) (car in use because not withdrawn from service);

*Chicago Great Western R. Co. v. Schendel,* 267 U.S. 287, 291–92, 45 S.Ct. 303, 69 L.Ed. 614 (1925) (car in use where use, movement and hauling had not ended); *Great Northern Ry. Co. v. Otos,* 239 U.S. 349, 351, 36 S.Ct. 124, 60 L.Ed. 322 (1915) (car in use when merely subjected to delay); *Fort St. Union Depot Co. v. Hillen,* 119 F.2d 307, 312 (6th Cir.1941) (train not withdrawn from service at time employee was injured). The consistent pattern in these cases is to exclude from the SAA's coverage "only such functions as are necessary to detect and correct those defective conditions for which absolute liability will be imposed." *Angell,* 618 F.2d at 262.

Although some common factors are considered in each case, the cases primarily demonstrate that "[t]he inquiry into whether a train was 'in use' under the [SAA] is neither simple nor straightforward." *Paul v. Genesee & Wyoming Industries, Inc.,* 93 F.Supp.2d 310, 316 (W.D.N.Y.2000). "The inquiry is challenging because precedent on the issue tends to be very fact-specific, and because there are generally no bright lines that demarcate when a train is in use and when it is not." *Id.* (citations omitted).

In an effort to provide some standard principles to guide the "in use" analysis, two basic "tests" have developed in federal law with regard to the "in use" requirement. The "bright line" test established by the Fifth Circuit in *Trinidad v. Southern Pac. Transp. Co.,* 949 F.2d 187 (5th Cir.1991), and the "totality of the circumstances" test established by the Fourth Circuit in *Deans v. CSX Transp., Inc.,* 152 F.3d 326 (4th Cir.1998).

In *Trinidad,* a carman, Jesus Trinidad, "was performing the final steps of a routine brake inspection" in accordance with federal regulations that require the brakes to be tested for air leaks after a train is made up. 949 F.2d at 188. During the inspection, Trinidad detected and repaired an air leak in the brake system of one of the railcars. *Id.* Trinidad drove his truck to the head of the train to inform the engineer. *Id.* As Trinidad walked across a set of tracks between his truck and the train he had inspected, he was hit by a "cut" of cars being moved up the track. *Id.* Trinidad argued that the air leak was a legal cause of his injury because he was injured while attempting to notify the engineer of the air leak. *Id.* The air leak was an alleged defect under the SAA. *Id.*

The Fifth Circuit noted that the SAA is only applicable if a train is "in use," "running," or being "hauled." *Id.* The Fifth Circuit asserted, "Generally, courts have not applied the [SAA] to trains involved in switching operations—those procedures by which the cars and engines are uncoupled, moved, and reassembled—even though such trains are in motion. Trains that have completed the switching process, and departed for their destinations, however, are subject to the [SAA's] requirements, whether or not they are actually in motion when the defect occurs." *Id.* at 188–189 (citations omitted). "[T]he distinction between switching and train operations established in older cases remains relevant in determining whether a train is 'in use' or 'being run' for the purposes of the [SAA]. The initial inspection of a train, however, appears to fall squarely between the switching and post-departure categories." *Id.* at 189. The Fifth Circuit noted that at the time of the accident in the case before it, the train had not moved from the spot of its assembly "because it had not been released following inspection because the inspection was not yet complete." *Id.* at 189.

In *Deans,* a conductor, Dennis Deans, and an engineer were assigned to take a train to another location. When Deans arrived at the yard, the railcars making up

the train were already coupled together; however, before the train could leave, Deans had to perform the following three tasks: (1) couple the engine to the railcars; (2) release the hand brakes on the railcars; and (3) conduct a pre-departure brake test. After coupling the engine, but prior to conducting the air brake test, Deans was injured while trying to release the hand brake on the third car. The hand brake was found to be defective. After Deans filed suit, CSX moved for summary judgment on the grounds that the railcar was not "in use" at the time of Deans's accident.

The Fourth Circuit noted that the district court relied on the Fifth Circuit's decision in *Trinidad*. *Deans*, 152 F.3d at 329. The Fourth Circuit asserted:

> Analogizing the facts in this case to *Trinidad*, the district court noted that the air brake test had yet to be completed at the time of Deans's injury and no movement of the train was imminent, and therefore concluded that the train that injured Deans was not "in use" at the time of the accident. This focus on the completion of the air brake test suggests that the district court sought to draw a useful and practical, bright-line distinction between trains which have had their pre-departure inspections and tests completed and been okayed for service (and are therefore "in use"), and those for which pre-departure tests have not yet been completed (and therefore are not "in use"), such a distinction is too facile to accurately reflect the multitude of steps required—and various sequences in which these steps may be taken—to prepare a train for departure. For example, while the district court here concluded that the train was not "in use" at the time of Deans's injury because the train would not be "okayed" for service until the air brake test was completed and, at the time of the acci-

dent that had not yet been done, the record shows that there is no relationship between the release of the hand brakes, during which activity Deans was injured, and the performance of the air brake test; it apparently does not matter whether the hand brakes were released before the air brake test was run. Therefore, under the district court's analysis, the train here—which had already passed its required inspections— would have been okayed for service and hence "in use" if Deans had simply chosen to conduct the air brake test prior to releasing the hand brakes.

> It is inappropriate to base liability under the [SAA] on the mere happenstance of whether an employee chooses to release the hand brakes or conduct an air brake test first, however, and we believe a more consistent and fairer result is reached by looking at a number of different factors, rather than simply at the completion or non-completion of pre-departure tests. Therefore, to determine whether a train is "in use" for purposes of the [SAA], the primary factors we consider are where the train was located at the time of accident and the activity of the injured party.

*Id.* at 329 (citations omitted).

The Fourth Circuit noted that in the case before it, the train already had its engine coupled and was standing on a track in the rail yard in preparation for imminent departure—"not in storage or waiting to be moved into a repair location." *Id.* at 330. In addition, Deans was part of the transportation crew and was not involved in the repair or maintenance of the train. *Id.* Deans's job was to put the train in motion, and he was engaged in an activity to do exactly that by releasing the hand brake. *Id.* "The fact that the air brake test still needed to be completed, a test

that could have been completed prior to the release of the hand brakes, is not in this case dispositive." *Id.* The Fourth Circuit held as a matter of law that the train was "in use" at the time of Deans's injury.

The Fourth Circuit applied its newly established test and reached the opposite result in *Phillips v. CSX Transp., Inc.,* 190 F.3d 285 (4th Cir.1999). In that case, Jeffrey Phillips, the foreman of a yard crew, was engaged in "normal train switching operations" consisting of taking arriving trains apart and putting departing trains together. *Phillips,* 190 F.3d at 286. The Fourth Circuit discussed the nature of those switching operations as follows:

> The normal procedure when a train arrives at the yard is for the yard crew to disconnect all of the train's cars from one another, and to turn the cars over to the car department for a mechanical inspection. As part of its inspection, the car department checks the cars' safety appliances. If the car department discovers any defects during this inspection, it sets the defective cars aside for repair. Once the mechanical inspection is complete, the car department turns the cars back over to the yard crew. The yard crew then assembles the cars into new trains for departure. However, before a train may depart, it must undergo a predeparture inspection, which the car department also conducts. The yard crew engages the handbrakes on the cars in an assembled train, detaches the engine, and then turns the train over to the car department for the predeparture inspection. The car department inspects the train's air brakes and again checks its safety appliances. Once the predeparture inspection is complete, the car department turns the train over to the transportation crew, and the train departs.

*Id.* at 286–287. Phillips was injured while engaging the handbrakes on a completed train prior to turning the train over to the car department for its predeparture inspection when a handrail broke. *Id.* at 287. The train was sitting on yard track at the time. *Id.* The district court granted summary judgment in favor of Phillips, finding that the train was "in use." *Id.*

The Fourth Circuit noted that the district court did not have the benefit of its decision in *Deans* in rendering its judgment. *Id.* at 289. The Fourth Circuit asserted that Phillips's case differed significantly from *Deans* with respect to the two *Deans* factors. *Id.*

> While in both cases the trains were assembled and sitting in the yard, the train in *Deans* was undergoing its predeparture inspection, it was coupled to its engine, its handbrakes were being released, and its departure was "imminent." In this case, on the other hand, the train was about to be uncoupled from its engine, its handbrakes were being engaged, and it had yet to undergo its predeparture inspection. Moreover, the plaintiff in *Deans* and Phillips in this case were engaged in very different activities at the time of their injuries. The plaintiff in *Deans* was a member of the train's transportation crew, whereas Phillips was a member of the Cumberland yard crew. Phillip's responsibilities were limited to switching operations. Plus, the plaintiff in *Deans* was injured while releasing the train's handbrakes, while Phillips was hurt while engaging his train's handbrakes to prevent it from moving. Finally, in *Deans* we emphasized the fact that the plaintiff could have released the handbrakes after the predeparture inspection, in conjunction with the departure of the train. In this case, Phillips had to engage the handbrakes prior to the predeparture inspection, in conjunction with

the assembly of the train. Taken together, the facts in this case show that Phillips was injured at the end of the switching process, rather than at the beginning of the departure process. *Id.* at 289–90. The Fourth Circuit held that the train was not "in use" at the time of Phillips's injury. *Id.* at 290.

The Fourth Circuit's test is more useful than the Fifth Circuit's bright line test in resolving the "in use" requirement taking into consideration: (1) the stated purpose of the "in use" limitation; and (2) general congressional intent to provide liberal recovery for injured railroad workers. As previously noted, the stated purpose of the "in use" limitation is to give railroads the opportunity to inspect for and correct safety appliance defects before being exposed to the SAA's strict liability for such defects. Applying the Fourth Circuit's test, the location of the train is important for purposes of determining whether the railroad had the opportunity to complete the type of inspection that the SAA requires before imposing strict liability. The activity of the injured party is also important to determine whether the activity normally occurs before the railroad had the opportunity to complete its inspection or after the railroad's inspection.

Applying the Fourth Circuit's test, the railcar in the instant case was in a group of coupled railcars on an outbound track. No further inspection was to occur except for the cursory inspection by Jones in preparing the cars for departure. Jones had already engaged in his cursory inspection of the handhold before climbing onto the car and only fell while using the handhold to climb off the car. Therefore, the stated purpose of the "in use" limitation—to give railroads the opportunity to inspect for and correct safety appliance defects before being exposed to the SAA's strict liability for such defects—had been satisfied, i.e.,

the inspection of the handhold had been completed. *See Phillips v. CSX Transp., Inc.*, 190 F.3d at 288 (noting purpose of "in use" limitation); *Angell*, 618 F.2d at 261 (noting completion of inspection to be critical factor). Furthermore, Jones was a switch foreman involved in the transportation of railcars. Jones was injured while releasing the handbrake on a railcar, and the movement of the railcars was imminent.

The majority contends that the departure of the cars was "far from imminent" because the engine would not be coupled to the cars for a number of hours. However, the record reveals that the engine was in the process of being coupled at the time Jones was injured in order to move the cars from the Lubrizol lead to the Lubrizol siding. Although the cars may have remained on the Lubrizol siding while Jones and his co-workers went to other facilities to pick up additional cars, the train was "in use" for purposes of moving the cars from the lead to the siding. The engine had to be coupled to the cars and all air hoses had to be attached in order to move the cars for that purpose, and no further inspection apart from the air brake test would be undertaken when the workers returned to Lubrizol to collect the railcars to return to the yard. If the majority's conclusion is correct, and the fact that the cars were not in the yard is a decisive factor, a worker engaged in collecting railcars from industries to be returned to a yard could never recover under the SAA because a train involved in this type of hauling operation would never be considered "in use." I do not believe that this conclusion is consistent with the stated purpose of the "in use" limitation.

I would therefore hold that the railcar was "in use" at the time of Jones's injury.

Because the majority holds otherwise, I dissent.