William E. HAWORTH, Plaintiff,

v.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, a
Delaware corporation, Defendant.

No. CS–02–0344–JLQ.

United States District Court,
E.D. Washington.

Aug. 19, 2003.

James K. Vucinovich, Yaeger, Jungbauer, Barczak & Vucinovich, Bellevue, WA, for William E Haworth, plaintiff.

Daniel Louis Kinerk, Gibson Kinerk, LLP, Bellevue, WA, for the Burlington Northern and Santa Fe Railway Company, a Delaware corporation, defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

QUACKENBUSH, Senior District Judge.

BEFORE THE COURT is Plaintiff's Motion for Summary Judgment (Ct. Rec.15). Plaintiff seeks to establish Defendant's liability as a matter of law under the Locomotive Inspection Act, 49 U.S.C. § 20701 *et seq.* Plaintiff also seeks to preclude Defendant's affirmative defense of contributory negligence. Plaintiff is represented by **James K. Vucinovich.**

Defendant is represented by **Daniel L. Kinerk**.

## PRELIMINARY MATTERS

Counsel are cautioned that they must strictly observe Local Rule 7.1 which prohibits the citation of unpublished decisions. Counsel are further cautioned that all footnoted material must be double spaced and appear in 14 point typeface.

## BACKGROUND

As this is Plaintiff's motion, the evidence and inferences arising therefrom are viewed in the light most favorable to the Defendant. The following facts are undisputed, unless otherwise noted.

At all times relevant to this Complaint, Plaintiff William Haworth ("Haworth") was employed as a conductor for Defendant Burlington Northern and Santa Fe Railway ("BNSF"). On October 24, 2001, Haworth reported to work at the Whitefish, Montana station. Haworth was scheduled to serve as the conductor on a route from Stryker, Montana to Spokane, Washington. From Whitefish, Haworth and his engineer, John Warner ("Warner"), were transported to Stryker by van. The van dropped Haworth and Warner off at the lead locomotive approximately thirty minutes later. Upon arrival, Haworth exited the van with his air pack and duffle bag (also referred to as a "grip") and proceeded to walk to the locomotive. The train had been "tied down" in a siding by the prior crew, which means that the locomotive is running with its handbrakes set. When Haworth reached the locomotive, he set his air pack on the catwalk, placed the strap of his grip over his left shoulder, and climbed up the ladder to board the train.

Haworth asserts that the interior of the train was not well lit, and that the angle at which he had to enter the train made it impossible to see the floor. Defendant asserts that at the time of the incident it was still daylight, and that Haworth did not make use of his lantern, which he was carrying at the time, nor did he attempt to turn on the light located in the cab of the locomotive. Haworth asserts that he did not know there was a light switch just inside the door.

An air hose had been left on the floor of the cab, just inside the door. The air hose was approximately 6 to 8 inches long and about 2 inches in diameter with two glad hands on either end. Haworth unequivocally states that he tripped on the air hose and fell. Warner was at the bottom of the ladder preparing his grip and air pack to board the locomotive. Warner did not see Haworth fall, but heard the commotion and climbed aboard to find Haworth sitting in the entry doorway. Warner confirms that he saw the air hose (or hoses) on the floor, however, Defendant asserts Warner could not conclude that the air hose caused Haworth's fall.

In his deposition, Warner provided the following information:

Q. Did you see what caused to make him fall?

A. I believe the air hose, yes.

Q. Where was the air hose that caused to make him fall [sic], Mr. Warner?

A. Just inside the doorway.

Warner Dep. at 14 (April 23, 2003). In support of its argument that Warner could not have determined the cause of the fall, Defendant cites to Warner's July 30, 2003 declaration where Warner states:

I then heard a commotion and climbed onto the nose of the locomotive where I found Mr. Haworth sitting in the entry doorway. I also saw an air stub hose approximately 6 to 8 inches long and about 2 inches in diameter on the floor near Mr. Haworth.

Defendant argues that because Warner did not see Haworth fall, Warner could not

conclusively say the air hose was the cause. It is questionable, however, whether this establishes a dispute of material fact in light of Warner's statement in his deposition that he believed the air hose was the cause of the fall. In addition, shortly after the accident three other BNSF employees inspected the accident site. There were several other items on the floor of the cab, including "FRED" batteries, a "MARY," and a water box. Each of the BNSF inspectors admitted the presence of the air hose on the floor and that it constituted a tripping hazard. There is a dispute as to whether Haworth continued working or immediately determined that he could not make the trip to Spokane.

There is also a dispute about whether an inspection of the locomotive was required before the train departed from Stryker, Montana. Federal regulations require that locomotives be inspected each calendar day. It was Warner's responsibility as the engineer to check the train to make sure the necessary daily inspection had taken place. Warner states that because Haworth climbed aboard the train first, he had not yet determined whether a daily inspection was warranted. Warner conducted the daily inspection of the locomotive after Haworth fell. The inspection took approximately 15 minutes to complete.

### SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. FED. R. CIV. P. 56(c);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir.2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

### ANALYSIS

### I. DEFENDANT'S LIABILITY AS A MATTER OF LAW

#### A. The Federal Employers' Liability Act

 The Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, holds railroad employers liable for the injuries sustained as a result of the negligence of the railroad or its agents. Federal law controls the interpretation of FELA. *Spokane, P. & S. Ry. Co. v. Martin*, 80 F.2d 322, 324 (9th Cir.1935). Under FELA, the test is whether the employer's negligence played any part, even the slightest, in producing the injury for which the damages are sought. *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); *see also Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 503 (9th Cir.1994). Proof of a

violation of the Locomotive Inspection Act (formerly the Boiler Inspection Act) is enough to establish negligence as a matter of law. *Urie v. Thompson,* 337 U.S. 163, 189, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

### B. The Locomotive Inspection Act

■ Under the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 *et seq.,* and the former Federal Boiler Inspection Act ("BIA"), 45 U.S.C. § 23, it is unlawful for a railroad to use any locomotive or tender on its lines unless the vehicle has been inspected, is able to withstand prescribed safety tests, and is safe to operate. A railroad's violation of the LIA results in strict liability. *Lilly v. Grand Trunk Western R. Co.,* 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943); *Crockett v. Long Island R.,* 65 F.3d 274 (2nd Cir.1995).

#### 1. Whether the Locomotive Was "In Use" at the Time of the Accident

■ The locomotive must be "in use" in order for liability to attach under the LIA. *McGrath v. Consolidated Rail Corp.,* 136 F.3d 838 (1998). The determination of whether a locomotive is "in use" is a question of law. *Id.* A locomotive need not be in motion for it to be "in use" under the statute. *Crockett,* at 277. The general rule is that once a locomotive has been taken to be serviced in a place that is designated only for repair, it is no longer "in use" within the meaning of the BIA. *Steer v. Burlington Northern, Inc.,* 720 F.2d 975 (8th Cir.1983). Defendant argues that this train was not "in use" because it was still in its predeparture inspection phase. Not all servicing, however, takes a train out of the scope of the LIA. The final determination of whether a train is "in use" requires a consideration of the circumstances of each case.

In *Brady v. Terminal R. Ass'n,* 303 U.S. 10, 13, 58 S.Ct. 426, 82 L.Ed. 614 (1938), the Supreme Court held that a train that had been placed on a temporary receiving track pending the continuance of its journey was "in use." The Fifth Circuit, in *Trinidad v. Southern Pacific Transportation Co.,* 949 F.2d 187 (5th Cir.1991), adopted the rule that a train is not "in use" until it is fully assembled and the crew has completed their predeparture inspection. Other circuits, however, have rejected the *Trinidad* standard. In *Deans v. CSX Transportation, Inc.,* 152 F.3d 326 (4th Cir.1998), the court determined that it must look at a variety of factors to determine whether a train was "in use," the most important being where the train was located at the time of the accident and the activity of the injured party. *Id.* at 329. Based upon that standard, the *Deans* court held that a train that had its engine coupled and was standing on a track in the rail yard preparing for imminent departure, rather than in storage or waiting to be moved to a repair location, was "in use" for purposes of the Safety Appliances Act, 49 U.S.C. § 20301 *et seq. Id.* (the Safety Appliances Act contains the same restriction that the locomotive must be "in use" as is found in the LIA and the former BIA).

In *McGrath v. Consolidated Rail Corp.,* 136 F.3d 838 (1st Cir.1998), the train was neither operating on a main line nor being stored on a yard track awaiting repair. Rather, the locomotive was running on the yard track and ready to move into service. *Id.* at 842. The court held that because the locomotive was ready to move into service, and the injured transportation crew member, an engineer, was performing inspection duties incidental to his task of operating the train when the accident occurred, that the train was "in use" for purposes of the BIA. *Id.* An engine that was leaving a maintenance area and being moved to a nearby track where it would depart later that night was "in use" and within the purview of the BIA. *Angell v. Chesapeake and Ohio Ry. Co.,* 618 F.2d

260 (4th Cir.1980)(opining that the case law construing the statute excludes injuries resulting from inspection, repair and servicing at maintenance facilities, but did not exclude the accident in the case at bar, where the engine had completed its servicing at the maintenance center and was being prepared to pull a train several hours later).

■ In the case *sub judice*, the train was "tied down," meaning its engines were running and its handbrakes were set. Haworth and Warner were transported to the train where it was waiting in Stryker, Montana. Notwithstanding the accident, after a brief predeparture inspection by Engineer Warner, the train was ready to move into service. The rule in *Trinidad*, that a train is not "in use" until all predeparture inspections are completed, is in the minority. I reject the *Trinidad* ruling. Further, there is no allegation that this train was in a maintenance yard nor that it was it being worked on by yard workers as opposed to transportation crew. The cases which deny coverage under the strict liability statutes often involve injuries to yard workers as opposed to transportation crew. *See e.g. Phillips v. CSX Transportation*, 190 F.3d 285 (4th Cir.1999)(a train that was being worked on by a yard crew member, and that was at the end of its switching process as opposed to being the beginning of the departure process, was not "in use" at the time of the accident in question); *Pinkham v. Maine Central R. Co.*, 874 F.2d 875, 882 (1st Cir.1989)(a train that had been taken out of active service, and was being worked on in a temporary repair yard, was not "in use" for purposes of the BIA).

Haworth had to board the train to perform his essential duties as conductor of the train. Defendant's argument that the train was not "in use" because Engineer Warner had not conducted his predeparture inspection is without merit. The court should note that it is questionable whether a predeparture inspection was even required at that point as the train had been inspected the previous calendar day. Further, Defendant admits that while Engineer Warner was performing the predeparture inspection, Haworth was to be installing batteries in the FRED and arm it to the MARY so that the device could be installed in the locomotive cab. Because Haworth needed to board the train in order to start performing these duties, and Defendant admits these duties were to be performed concurrent with Warner's brief fifteen-minute predeparture inspection, the predeparture inspection was clearly not one that would take place before any other transportation member was allowed to work on or board the train. The train, which was in its final predeparture stages, and being neither serviced nor repaired, was "in use" for purposes of the LIA.

2. *Whether the Plaintiff Must Prove that the Air Hose was an Essential Part or Appurtenance to Recover Under the LIA*

■ The Supreme Court has held that the carrier's duty under the former BIA to keep its locomotives in proper and safe condition extended to protection against foreign matters on the surface of the locomotive. *Lilly v. Grand Trunk Western R. Co.*, 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943). The *Lilly* Court stated that the Act should be read broadly enough to include conditions other than purely mechanical imperfections which render equipment unsafe to operate. Id. at 487–88, 63 S.Ct. 347. The railroad safety regulations provide in pertinent part:

Floors of cabs, passageways, and compartments shall be kept free from oil, water, waste or *any obstruction that creates a slipping, tripping or fire haz-*

*ard.* Floors shall be properly treated to provide secure footing.

49 C.F.R. § 229.119(c) (emphasis added).

Defendant cites to *McGinn v. Burlington Northern R. Co.,* 848 F.Supp. 827 (N.D.Ill.1994), for the argument that Haworth must prove that the air hose was a essential part or appurtenance of the locomotive in order to recover under the LIA. Defendant's reliance on *McGinn* is misplaced. *McGinn* held that where a crew member tripped over his own luggage, which the crew member himself placed in middle the walkway, the railroad was not strictly liable under the BIA. *Id.* at 828 (stating the general rule that the railroad has a duty under the BIA to keep the floors clear of oil, grease, snow, ice, and unsafe conditions such as broken floor or loose bolts).

The bulk of the authority expressly prohibits the narrow reading of the LIA that Defendant argues this court should apply. *See Lilly, supra* (failure to keep ice off locomotive tender surfaces violated regulations which required railroad to keep surfaces clean); *Gowins, infra* (oil on locomotive walkways could support a BIA claim); *Calabritto v. New York, N.H. & H.R.R.,* 287 F.2d 394 (2nd Cir.), *cert. denied,* 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 387 (1961) (dangerous conditions caused by foreign substances on a locomotive platform gave rise to liability under the BIA).

The Fourth Circuit has held that, under the BIA, the question of whether a loose metal object on the floor of the train rendered a locomotive "unsafe to operate" was a question for the jury. *Topping v. CSX Transportation, Inc.,* 1 F.3d 260 (4th Cir. 1993). In *Whelan v. Penn. Central Co.,* 503 F.2d 886, 889 (2nd Cir.1974), evidence of two uncorrected defects, along with an icy condition on the bottom step where the brakeman was required to step to signal the engineer to stop the train, was suffi-cient to support a jury finding that the railroad violated the BIA.

In this case, however, no less than three BNSF employees admit that the hose constituted a tripping hazard and confirmed the presence of an air hose (or hoses) where Haworth fell. Engineer Warner stated in his deposition: "I moved the air hose into the corner." Warner further states "I believe the air hose, yes [caused Haworth's fall]." Walter Bartholomew, Randy Wolff, and Rico Montini were all part of the three person inspection team that inspected the accident site immediately after Haworth's fall. Bartholomew stated: "There were multiple hoses." When asked whether these hoses would constitute a tripping hazard, Bartholomew answered "certainly." Wolff and Montini were also asked whether an air hose would pose a tripping hazard, and both agreed that it would. Wolff also confirmed the presence of the air hose where Haworth fell.

The railroad had a duty to keep all cab floors, passageways, and compartments free from obstructions that create a slipping or tripping hazard. Defendant admits, and no less than three of its employees concur, that the presence of the air hose on the floor where Haworth fell constituted a tripping hazard. It is not necessary for Haworth to prove that the air hose itself was an essential part of the train, the floor itself must be kept in safe condition under the LIA.

### C. Conclusion

██ BNSF has failed to show that there is a genuine issue of material fact as to the LIA claim. In fact, BNSF has admitted the material facts which may have been in dispute, namely the presence of the air hose and that it constituted a tripping hazard. The presence of a foreign object or tripping hazard on the floor

cab or passageway is a violation of the LIA and its corresponding regulations. As discussed *supra,* the locomotive was in use at the time of the incident. Accordingly, Haworth has established that he is entitled to judgment as a matter of law as to liability on the LIA claim.

## II. CONTRIBUTORY NEGLIGENCE

■ The general rule is that a plaintiff cannot recover damages which are not proximately caused by a defendant's alleged negligence. *Shupe v. New York Central System,* 339 F.2d 998, 1000 (7th Cir.1965)(holding that a second accident, which plaintiff did not seek to hold his employer liable for, was an intervening cause which precluded an award of future loss earnings). The FELA statute specifically addresses the issue of contributory negligence. 45 U.S.C. § 53 provides:

> In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

■ Under FELA, the question of whether the injury could be attributed to other causes, including the employee's own contributory negligence, is not relevant to the issue of *liability* because the statute expressly imposes liability on the employer for an injury due "in whole or in part" to its negligence. *Rogers,* at 507, 77 S.Ct. 443. An employee's contributory negligence may limit the amount of damages he or she is able to recover under a FELA action, *provided,* that no employee shall be held guilty of contributory negligence in any case where the violation of any statute enacted for the safety of employees contributed to the injury. *Id.* at 507, n. 12, 77 S.Ct. 443 (emphasis added). Accordingly, proof of violation of one of the safety statutes eliminates contributory negligence as a consideration for any purpose. *Carter v. Atlanta & St. A.B.R. Co.,* 338 U.S. 430, 436–37, 70 S.Ct. 226, 94 L.Ed. 236 (1949); *see also Gowins v. Penn. R. Co.,* 299 F.2d 431, 432–34 (6th Cir.1962)(where a railroad employee tripped over an air hose that was lying on the ground outside the ties in violation of a railroad safety rule, it was error for the district court to refuse to submit the plaintiff's BIA claim to the jury because the partial defense of contributory negligence is not a bar to recovery).

■ BNSF submits that there is a question of fact regarding Haworth's failure to turn on the light switch or use his lantern when boarding the locomotive. These facts, however, would only be relevant if the accident was unrelated to BNSF's violation of the one of the strict liability safety statutes. Here, Haworth has established that Defendant is strictly liable under the LIA. Defendant BNSF violated the LIA and its corresponding regulations by failing to keep all cab floors free from tripping hazards. Accordingly, BNSF is precluded from asserting contributory negligence as a defense to this claim.

### SUMMARY OF CONCLUSIONS

For all the foregoing reasons, **IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Summary Judgment on the Issue of Liability is **GRANTED.** (Ct.Rec.15).

2. Plaintiff's Motion for Summary Judgment Seeking to Preclude the Affirmative Defense of Contributory Negligence is **GRANTED.** (Ct. Rec.15).

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.