# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-2151

———————

Brian Wright,                              \*
                                           \*
       Appellant,                 \*
                                           \*
                                           \*   Appeal from the United States
   v.                                  \*   District Court for the
                                           \*   Western District of Arkansas.
Arkansas & Missouri Railroad               \*
Company, A Corporation,                     \*
                                           \*
       Appellee.                  \*

———————

Submitted: January 15, 2009
Filed: July 29, 2009

———————

Before MURPHY and SMITH, Circuit Judges, and LIMBAUGH, District Judge.[1]

———————

SMITH, Circuit Judge.

Brian Wright, who was injured while working as an assistant conductor for appellee Arkansas & Missouri Railroad Company (AMR), brought suit against AMR pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51, *et seq.*, and the Locomotive Inspection Act (LIA), 49 U.S.C. § 20701, *et seq*. The district court[2]

---

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

granted AMR's motion for summary judgment on Wright's LIA claim after holding that the train was not "in use" at the time of the accident. Wright's FELA claim proceeded to trial, and the jury awarded him total damages amounting to $92,000. But because the jury also determined that Wright was 40 percent at fault, his net recovery was $55,200.

Wright appeals on three grounds: (1) the district court applied different standards for proximate causation when it submitted the parties' theories of negligence and contributory negligence; (2) the district court admitted irrelevant evidence solely designed to prejudice Wright; and (3) the district court erred by holding that the LIA did not apply. We affirm the district court on each ground.

## I. *Background*

On November 11, 2005, Wright was employed by AMR as a trainee for the position of brakeman/conductor. Wright arrived at AMR's rail yard in Fort Smith, Arkansas, shortly before 7:00 a.m., while it was still dark outside, and began preparing for a run on AMR's locomotive with two other employees. After receiving and organizing papers detailing the crew's job orders, Wright climbed onto the locomotive to put up his bags. As he was coming back down the ladder of the locomotive, he slipped on an oil-covered step, fell to the ground, and injured his left shoulder and back.

At the time of the accident, the locomotive was on a "repair in place" (RIP) track undergoing a daily inspection by Bobby Locust. The locomotive had been parked on the track since the previous evening. Locust was tasked with inspecting the locomotive each morning prior to the engineering crew's scheduled departure at 7:00 a.m. According to Locust, he placed blue flags at the north and south ends of the locomotive. Then he started the engine and checked various parts of the locomotive including the oil and other fluids, brakes, and pistons. He testified that the last thing he did was to check the steps and walkways for grease and oil. Although he had not

completed inspecting the locomotive, he had completed an inspection card listing a completion time of 6:10 a.m.

The parties vigorously disputed the exact time that the accident occurred[3] and whether Locust had completed the inspection at the time of the accident. The parties also disputed the practice of boarding locomotives that were still "blue flagged." Wright testified that crew members routinely boarded locomotives to load their equipment while inspections were still underway. AMR countered that employees were subject to an unwritten rule prohibiting them from boarding locomotives before they were released by an inspector.

On the day of the accident, Wright was treated for his injuries at an outpatient clinic. He received follow-up care for two months after the accident. AMR assigned Wright to Ozark Transmodal, Inc., its sister company, where he was assigned to light-duty work such as sweeping floors and picking up trash.

On January 13, 2006, Wright left work early because he was not feeling well. He candidly admits that he did not notify his supervisor before leaving. AMR fired Wright after he left work that day. Ron Sparks, AMR's corporate representative, testified that he found Wright that same afternoon at a casino in Roland, Oklahoma. Wright later brought suit against AMR for his injuries. After a jury trial, Wright recovered $55,200 in damages. This appeal followed.

## II. *Discussion*

On appeal, Wright claims three prejudicial errors: (1) the district court applied different standards for proximate causation when it submitted the parties' theories of negligence and contributory negligence; (2) the district court admitted irrelevant

---

[3]Witness accounts varied between 6:30 a.m. and 7:10 a.m.

evidence solely designed to prejudice Wright; and (3) the district court erred by holding that the LIA did not apply. We will address each issue in turn.

## A. *Jury Instructions*

Wright first argues that the district court erred in applying different proximate cause standards for negligence and contributory negligence when it submitted the jury instructions.

We review jury instruction submissions for abuse of discretion. *Rush v. Wyeth (In re Prempro Prods. Liab. Litig.)*, 514 F.3d 825, 829 (8th Cir. 2008). The district court is given "broad discretion in choosing the form and language of the instructions." *Id.* (internal quotations and citation omitted). We will reverse only where the instructions "taken as a whole and viewed in the light of the evidence and applicable law" do not "fairly and accurately submit[] the issues to the jury." *Id.* (internal quotations and citation omitted). This error must "affect[] a party's substantial rights." *Id.* (internal quotations and citation omitted).

Wright argues that the district court's decision to apply a lighter burden for proximate causation for AMR's allegation of contributory negligence than for his allegation of negligence was in express derogation of *Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158 (2007). In *Norfolk*, the plaintiff was injured while working for a railroad company in Indiana and sued under FELA. *Id.* at 160–61. After a jury awarded plaintiff $1.5 million in damages, he appealed, arguing that the jury instructions reflected a more lenient causation standard for railroad negligence than for employee contributory negligence. *Id.* at 160. The instructions directed the jury to find the plaintiff contributorily negligent if he was negligent and that negligence "'directly contributed to cause' the injury." *Id.* at 161 (quoting Mo. Approved Jury Instr., Civ., No. 32.07(B), p. 519 (6th ed. 2002)). Conversely, the instructions allowed "a finding of railroad negligence if the railroad was negligent and its negligence contributed 'in whole or in part' to the injury." *Id.* (quoting Mo. Approved Jury Instr.,

Civ., No. 24.01 (1964). The Court noted that FELA did not expressly depart from the common law approach that applied the same causation standard to both plaintiff and defendant negligence. *Id*. at 168. The Court stated that "it is difficult to reduce damages 'in proportion' to the employee's negligence if the relevance of each party's negligence to the injury is measured by a different standard of causation." *Id*. at 169. Because different standards were applied below, the Court remanded the case for a determination of whether a new trial was needed. *Id*. at 172.[4]

---

[4]On remand, the Supreme Court of Missouri held that because Norfolk was not prejudiced by the disparate instructions to the jury, the error was harmless and no new trial was required. *Sorrell v. Norfolk S. Ry. Co.*, 249 S.W.3d 207, 209–10 (Mo. 2008).

Here, both the negligence[5] and contributory negligence[6] instructions

---

[5]The complete text of the negligence instruction is as follows:

JURY INSTRUCTION NO. 12
ESSENTIAL ELEMENTS OF CLAIM

Your verdict must be for the plaintiff if all of the following elements have been proved by a preponderance of the evidence:

First, defendant failed to provide reasonably safe conditions for work in that it failed to keep the ladder/steps on the locomotive free of oil or failed to warn plaintiff of the presence of any oil;

Second, defendant in any one of more ways described in the First Paragraph was negligent; and

Third, such negligence resulted in whole or in part in injury to plaintiff—"in whole or in part" means that the defendant is responsible if its negligence, if any, played any part, no matter how small, in causing the plaintiff's injuries; this, of course, means that the defendant is not responsible if any other cause, including plaintiff's own negligence, was solely responsible.

If any of the above three elements has not been proved by the preponderance of the evidence, or if you find in favor of the defendant under Instruction No. 13, then your verdict must be for the defendant.

[6]The complete text of the contributory negligence instruction is as follows:

JURY INSTRUCTION NO. 14
CONTRIBUTORY NEGLIGENCE

If you find in favor of plaintiff, you must consider whether plaintiff was also negligent. Under this instruction, you must assess a percentage of the total negligence to plaintiff if all of the following elements have been proved by the preponderance of the evidence:

First, plaintiff—
*      failed to heed warnings to not enter the locomotive until it had been inspected and cleared by maintenance; and/or
*      failed to wear proper boots; and/or

-6-

permitted the jury to allow the claim if Wright's injury "resulted in whole or in part" from the negligence. These instructions, unlike the *Norfolk* instructions, do not apply different causation standards.

Wright asserts that the jury should have been instructed that AMR's failure to warn Wright not to board the train was a potential cause of Wright's injuries. Specifically, the district court refused Wright's request that the jury be instructed that it could find AMR negligent if AMR "failed to warn [Wright] *it was unsafe to board the locomotive*." The district court instead instructed the jury that it could find AMR negligent if AMR, inter alia, "failed to warn [Wright] *of the presence of any oil*." These instructions are sufficiently close and legally adequate such that no abuse of discretion occurred in choosing one over the other. Requiring AMR not only to warn of oil on the steps but also to warn that it is unsafe to board when that condition is present is unnecessary. The district court's instruction would hold Wright liable if the jury found that AMR had a duty to warn and failed to do so. Moreover, Wright's own negligence instruction was virtually identical to the instruction given.

Wright correctly cites *Ackley v. Chicago & North Western Transportation Co.*, for the proposition that a railroad has a duty to reasonably foresee unsafe working conditions and that a jury instruction negating this duty is prejudicial. 820 F.2d 263, 268 (8th Cir. 1987). The instruction given to the jury in this case did not negate

---

        *      failed to be alert for slipping hazards; and/or
        *      failed to use a lantern or a flashlight;
     Second, plaintiff was negligent in any one or more of the ways described in the First paragraph; and
     Third, such negligence of plaintiff resulted in whole or in part in his injury.
     If any of the above elements have not been proved by the preponderance of the evidence, then you must not assess a percentage of negligence to plaintiff.

AMR's duty to reasonably foresee unsafe working conditions. *See id*. In fact, the jury instruction required the jury to find that the first element of negligence is satisfied if AMR "failed to provide reasonably safe conditions for work." Therefore, the jury instruction was not prejudicial in this regard.

Finally, Wright argues that he is entitled to his jury instruction so long as it is legally and factually correct. In *Rahn v. Hawkins*, 464 F.3d 813, 817 (8th Cir. 2006), the issue at trial was whether the officers had used excessive force under the Fourth Amendment when police officers shot and maced the plaintiff. *Id*. The plaintiff proffered a jury instruction that specifically addressed when officers may use deadly force, but the district court opted for a more general instruction. *Id*. Because the district court's instruction was "markedly different" than the plaintiff's legally and factually correct instruction, we remanded for a new trial. *Id*. at 818. In the present case, Wright's jury instruction is not "markedly different" from the final instruction. *See id*. As noted above, the instructions are virtually identical.[7] Because the district

---

[7]The complete text of Wright's instruction, which was refused by the district court, is as follows:

JURY INSTRUCTION NO.  (refused)

Your verdict must be for the plaintiff and against defendant if all of the following elements have been proved by the greater weight of the evidence.

First, defendant failed to provide reasonably safe conditions for work in that it failed to keep the ladder/steps on the locomotive free of oil, or failed to warn plaintiff it was unsafe to board the locomotive.

Second, defendant in any one or more of the ways described in Paragraph Second was negligent, and

Third, such negligence resulted in whole or in part in injury to the plaintiff–"in whole or in part" means that the defendant is responsible if its negligence, if any, played any part, no matter how small, in causing the plaintiff's injuries.

court has broad discretion in choosing the language of jury instructions, *In re Prempro*, 514 F.3d at 829, we cannot say that the district court abused its discretion.

## B. *Admissibility of Evidence*

Wright next argues that the district court abused its discretion by admitting evidence that: (1) AMR terminated Wright after his injuries occurred; (2) AMR found Wright at a casino after he left work; and (3) prior to the accident, Wright had been disciplined for missing work due to illness without calling a supervisor. Federal Rule of Evidence 402 provides that irrelevant evidence is inadmissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. A district court is given "broad discretion" to determine the relevance of evidentiary matters. *Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 884 (8th Cir. 2006). We will reverse that decision only if there is a "clear abuse of discretion." *Suggs v. Stanley*, 324 F.3d 672, 682 (8th Cir. 2003).

### 1. *Termination Evidence*

Wright argues that evidence regarding his termination was irrelevant and, therefore, inadmissible and argues that this evidence was prejudicial because it suggested his lost wages resulted from his termination and not from his injuries. He contends that *Martinez v. Union Pacific Railroad Co.*, 82 F.3d 223 (8th Cir. 1996), forecloses admission of evidence to show that his lost wages were caused by his termination rather than the injuries for which AMR was responsible. In *Martinez*, we held that evidence of appellant's dismissal was properly limited where it was offered solely to prove that appellant would not have continued working at the company for purposes of calculating future earnings. *Id.* at 227. Thirty minutes after appellant injured himself by falling off the end of a ramp used to service trains, he was

---

If any of the above three elements has not been proved by the preponderance of the evidence, or if you find in favor of the defendant under Instruction No. 13, then your verdict mst be for the defendant.

terminated at an unrelated disciplinary hearing. *Id.* at 225. After a jury verdict for appellant on his FELA claim, the railroad appealed, arguing, inter alia, that the district court erred by excluding testimony that appellant had been terminated. *Id.* at 225, 227. The railroad sought to admit this evidence to rebut appellant's expert testimony that appellant "would have continued working as a trainman . . . until the age of 67" and to rebut the expert's calculation of appellant's loss of future earning capacity. *Id.* at 227. We held that it was proper to exclude this evidence because appellant's termination was wholly irrelevant to the issues presented at the trial and would have been more prejudicial than probative of those issues. *Id.* at 228.

Here, the district court initially instructed the parties to avoid the topic of Wright's dismissal because it was irrelevant to the issues presented at trial. This instruction followed *Martinez*. The court further stated that the evidence would be inadmissible so long as Wright did not open the door to its admission. We must determine whether Wright did indeed open that door.

At trial, Wright testified that he was not "physically able to go back to work for the railroad" and that he "had to leave work because [he] couldn't any longer do that work." Based on these statements, the district court found that Wright had opened the door and that it would be prejudicially unfair to leave the jury with the impression that physical limitations from the accident were the only reason Wright no longer worked at AMR. The district court, therefore, allowed AMR to introduce evidence of Wright's dismissal for misconduct. The district court did not admit this evidence to deny future earnings under FELA beyond the termination date, *see Martinez*, 82 F.3d at 227, but merely to rebut the impression left by Wright's own testimony. District courts are given broad discretion to determine the relevance of evidence, and we will only reverse if there is a clear abuse of discretion. *Suggs*, 324 F.3d at 682. Although the district court's call was close, it was not an abuse of discretion.

-10-

## 2. *Other Evidence*

Wright also argues that the district court abused its discretion by allowing evidence that he went to a casino after leaving work early and that he previously missed work without calling a supervisor. He contends that evidence of other crimes or wrongs is inadmissible unless relevant to a material issue other than character of a party. *United States v. Felix*, 867 F.2d 1068, 1072 (8th Cir. 1989) (stating that "for evidence of prior bad acts to be admissible it must be relevant to a material issue other than the character of the defendant"). Wright's statement of the law is correct, but his conclusion is erroneous because the evidence presented here was relevant to a material issue other than character. The district court determined that the evidence could bear on Wright's credibility in light of the fact that he testified that he left work early due to illness. The court also found that evidence that Wright failed to call a supervisor when he missed work was relevant to rebut Wright's contention that he loved his job. The district court is accorded broad discretion in evidentiary matters. *Id*. We cannot say that the court abused its discretion in admitting this evidence.

## C. *LIA Claim*

Finally, Wright argues that the LIA should apply because the locomotive was "in use" as shown by its preparation for imminent departure. The district court determined that the locomotive was not "in use" at the time of the accident and granted AMR's summary judgment motion. In reaching its conclusion, the district court noted that Wright was injured while "the locomotive was parked on a repair in place track with blue flags at the ends of the locomotive and on the throttle and locks on the switch. Further, the locomotive was still undergoing its daily inspection and it had not been released to the crew for use." For authority, the district court cited an unpublished Fourth Circuit opinion *Maynard v. Norfolk & Western Railway Co.*, No. 94-1285, 1995 WL 131363 (4th Cir. 1995) (unpublished per curiam), and a North Dakota district court decision footnote describing the usage of blue flags, *see Carder v. Ind. Harbor Belt R.R.*, 205 F. Supp. 2d 981, 985 n.3 (N.D. Ind. 2002). We review

de novo a district court's grant or denial of summary judgment. *M.Y. v. Spec. Sch. Dist. No. 1, Minneapolis Pub. Sch.*, 544 F.3d 885, 888 (8th Cir. 2008).

Under the LIA, a railroad carrier may not "use or allow to be used a locomotive . . . on its railroad line" unless the locomotive "and its parts and appurtenances" are, inter alia, "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). If the LIA applies, then the railroad will be held strictly liable and may not rely on the defenses of contributory negligence or assumption of risk. 45 U.S.C. §§ 53–54. The "in use" limitation gives the railroad an opportunity to remedy hazardous conditions before strict liability attaches to claims made by injured workers. Whether the LIA applies turns on whether the locomotive was "in use," which is a question of law for the district court. *Steer v. Burlington N., Inc.*, 720 F.2d 975, 977 n.4 (8th Cir. 1983) (applying the Boiler Inspection Act, which is the precursor to the LIA).

In *Steer*, we held that the locomotive was not "in use" because it was "being serviced in a place of repair." *Id.* at 976. The plaintiff was injured while repairing a locomotive that "had been taken to the 'Asparagus Patch,' a place for removal of locomotives and their repair." *Id.* We relied on the Fourth Circuit's reasoning that "'injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility'" are excluded from the Boiler Inspection Act's coverage. *Id.* at 976–77 (quoting *Angell v. Chesapeake & Ohio Ry. Co.*, 618 F.2d 260, 262 (4th Cir. 1980)). Therefore, we upheld the district court's finding that the locomotive was not "in use." *Id.* at 977. Other than *Steer*, we have not decided a case involving the standard to apply to determine whether a locomotive is "in use." Other circuits have addressed this issue.

In *Angell*, the Fourth Circuit held that the locomotive was "in use" where the railway had "okayed" the locomotive for service. 618 F.2d at 262. The plaintiff, a machinist, was injured while the engine was on a "service track" and had been "blue

flagged." *Id*. at 261. At the time of the injury, "all servicing, maintenance and inspection work had already been performed." *Id*. The court noted that Congress excluded injuries "directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility." *Id*. at 262 (citing H.R. Rep. No. 1974, 61st Cong., 3d Sess. 3 (1911)). *Angell* involved an injury that occurred after inspection, repair, and servicing had been completed and "during the uncoupling of a 'readied' engine in preparation for moving it to a nearby track to pull a train a few hours later." *Id*. Because the engine was not in need of further repair or servicing and had been "okayed" by railway officials, it was "in use" and the statute applied despite the presence of blue flags. *Id*.

Subsequently, the Fourth Circuit revisited its "in use" analysis and adopted a multi-factor test to determine whether a train is in use. *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 329 (4th Cir. 1998). In *Deans*, the court held that "to determine whether a train is 'in use' for purposes of the FSAA [Federal Safety Appliances Act], the primary factors we consider are where the train was located at the time of the accident and the activity of the injured party." *Id*. The court expressly rejected any analysis that would make a single factor, such as release from inspection, dispositive.[8] The court ultimately held that the locomotive was "in use" because the train "already had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure—not in storage or waiting to be moved into a repair location." *Id*. at 330.

---

[8]In *Trinidad v. Southern Pacific Transportation Co.*, the Fifth Circuit established a bright line test, stating that a train is not "in use" until its inspection is complete and the train has been released. 949 F.2d 187, 189 (5th Cir. 1991).

Wright relies heavily on the Supreme Court's decision in *Brady v. Terminal Railroad Ass'n*, 303 U.S. 10, 11–12 (1938),[9] and interprets it as compelling reversal. In *Brady*, a rail employee was injured while inspecting a car that was placed on a receiving track temporarily for an inspection. *Id.* at 11–12. The Court held that such a car is "in use" so long as it would continue to its next destination if it passed inspection. *Id.* at 13. The Court noted that the case was not a situation in which a defective car had reached a place of repair. *Id. Brady* is distinguishable, however, because the locomotive in that case never ceased to be "in use" during its temporary stop on the receiving track because it was "still in use, though motionless." *Id. Brady* does demonstrate that undergoing inspection, without more, is probably insufficient to establish that a train is not in use. *See id.* But in our case, it is undisputed that the train was not in use when initially placed on the RIP track for the night and blue-flagged. The crucial issue is determining whether the locomotive could be legally considered "in use" at the time of Wright's accident.

We hold that determination of whether a train is "in use" is to be made based upon the totality of the circumstances at the time of the injury. Based upon this record, we hold the district court correctly concluded that the locomotive was not in use in denying Wright's summary judgment motion.

The district court took into account that the locomotive was parked on an RIP track and marked by blue flags located on both ends of the locomotive and on its throttle.[10] In fact, the inspector had placed locks on the switch. The court noted that

[9]Although this case construed the Federal Safety Appliance Act, 45 U.S.C. § 11 (1976), its reasoning applies to the Locomotive Inspection Act. *See Steer*, 720 F.2d at 977 n.3.

[10]Although the inspector placed blue flags on the locomotive, this in and of itself is not dispositive of "in use" status. *See Angell*, 618 F.2d at 261 (holding the train was "in use" despite presence of blue flags); *see also Carder*, 205 F. Supp. 2d at 985 (finding that to determine "in use" status,"a blue flagged track alone is not

the locomotive was still undergoing inspection or service and had not been released to its crew. The court mentioned, but apparently gave little weight to, the scheduled 7:00 a.m. departure and Wright's activity. In granting summary judgment, the district court concluded that, "[u]nder these circumstances, the locomotive cannot be said to have been 'in use.'" The trial itself produced conflicting testimony regarding the completion of the inspection and whether Wright had permission to enter the locomotive. Although the locomotive stood on an RIP track, it was not at a maintenance facility. The train was scheduled for departure at 7:00 a.m., and Wright's injury occurred between 6:30 a.m. and 7:10 a.m. At the time of the accident, Wright, a conductor trainee, was loading his gear onto the train ostensibly in preparation for departure once the locomotive was cleared.

No single fact present is conclusive. The district court placed substantial weight on the location of the locomotive and its "blue-flagged" status and locked switch. The court properly considered this status in its analysis as a significant but not dispositive factor. The blue flag is widely recognized throughout the railroad industry as a signal, warning crews not to move locomotives in the surrounding area. *Carder*, 205 F. Supp. 2d at 985. In fact, blue flagging is mandated as part of the regulations of the Federal Railroad Administration's Railroad Operating Procedures.[11] The court properly considered these factors and other surrounding circumstances in reaching its ultimate

---

dispositive"). Moreover, there was evidence below that employees routinely entered the train during pre-departure inspection despite the presence of blue flags.

[11]In pertinent part, the regulations provide that when railroad employees are "engaged in the inspection, testing, repair, and servicing of [locomotives]" and are working "on, under or between [locomotives] on track other than main track," the locomotive must be blue flagged. 49 C.F.R. §§ 218.21, 218.27(e). Furthermore, once blue flags or blue lights have been placed, the locomotive cannot be moved or repositioned until the flags or lights have been removed and other workers on the affected track are notified. 49 C.F.R. §§ 218.23, 218.29.

conclusion. Therefore, the court did not err in determining that the locomotive was not "in use" at the time of the accident.

### III. *Conclusion*

Accordingly, we affirm the district court.

LIMBAUGH, District Judge, concurring.

I concur in the principal opinion affirming the district court on all issues, but I write separately to advocate a different approach to the Locomotive Inspection Act claim. The majority adopts a "totality of the circumstances" test to evaluate whether the accident occurred when the locomotive was "in use," which is a prerequisite to liability under the LIA. But the locomotive in this case was "blue flagged," which means, under LIA regulations, that the railroad is prohibited from moving the locomotive, and which is to say that the locomotive cannot be put "in use." A better rule then, in my mind, is that blue flagging creates a presumption that the locomotive was not in use.

Under the LIA, a railroad carrier cannot "use or allow to be used" a locomotive on its railroad line unless the locomotive "and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. Federal regulations implementing this statute articulate the railroad's obligation to provide a safe working environment, and they address in particular the kind of accident at issue in this case by providing that, "passageways . . . shall be kept free from oil . . . or any obstruction that creates a slipping [or] tripping . . . hazard." 49 C.F.R. § 229.119(c).

A railroad's violation of the LIA results in strict liability, Lilly v. Grand Trunk W. R.R. Co., 317 U.S. 481, 485 (1943), which is a critical matter in this case given the fact that the jury found that plaintiff was 40% negligent. If a railroad employer's

violation of the LIA contributes to the injury of a railroad employee, the employer cannot rely on the defenses of contributory negligence or assumption of risk, and will be found negligent as a matter of law under the FELA. 45 U.S.C. §§ 53, 54; Lilly, 317 U.S. at 491. Although contributory negligence is a partial defense under the FELA, it is not a defense under the LIA. Lilly, 317 U.S. at 485. However, a defendant is subject to strict liability under the LIA only if the locomotive was "in use" at the time of the accident. Steer, 720 F.2d at 976-77.

In this case, the accident occurred when the locomotive and two others were parked on a repair in place track with blue lights placed at the ends of each one. In addition, blue flags were lodged in the engine throttles and the track switch was locked to further prevent the locomotives from being moved. There is a dispute, however, whether the locomotive on which the accident occurred was still undergoing its daily inspection at the time of the accident. The inspection card had been signed, but the inspector testified that he did so before conducting the inspection. In any event, it is uncontested that the inspector was still working on one or more of the locomotives, that they were still blue flagged, and that they had not yet been released to the crew or crews. The issue, then, is whether, under these circumstances, the locomotive on which the accident occurred was "in use" under the LIA.

The district court found that the locomotive was not "in use" based principally on the facts that the blue lights had been set out to prevent the locomotive from moving, that the locomotive was not on the main line, and the locomotive was still under inspection at the time plaintiff was injured. Plaintiff claims this decision was in error because the majority of courts have held that the locomotive is "in use" if it is being prepared for imminent departure.

The only case in which the United States Supreme Court has addressed the "in use" question is Brady v. Terminal R.R. Ass'n of St. Louis, 303 U.S. 10 (1938). The Court, interpreting a nearly identical "in use" provision in the Federal Safety

-17-

Appliance Act, held that a rail car was "in use" when petitioner was injured while he was inspecting it. Id. at 11-13. The car was one of a string of cars that had been placed on a "receiving" or "inbound" track temporarily pending the continuation of a trip and would only be taken out of service if the inspection found a defect. Id. at 11, 13. Under the Court's reasoning, the car was "in use" because it was located on the receiving or inbound track, it had never been taken out of service, and the inspection was merely a temporary delay of the train's journey. Steer, 720 F.2d at 966.

The Eighth Circuit, too, has addressed this issue only once, in the 1983 decision, Steer v. Burlington N., Inc. In that case, a pipefitter was injured while repairing an engine, and this Court held that the engine was not "in use" because it could not be moved until the repairs were completed. Id. at 966.

Since the Supreme Court decision in Brady and this Court's holding in Steer, two competing tests have developed to determine whether a locomotive is "in use." The Fifth Circuit established a bright line rule in Trinidad v. Southern Pacific Transp. Co., 949 F.2d 187, 189 (5th Cir. 1991), holding that a train is "in use" only after it has been fully assembled and the pre-departure inspection complete. Id. at 189. On the other hand, the Fourth Circuit established a totality of the circumstances test in Deans v. CSX Transp. Inc., 152 F.3d 326, 329 (4th Cir. 1998), holding that to determine if a rail car is "in use" the court must look to several factors, with particular emphasis on the location of the car and the activity of the inured party.

Despite these generally recognized tests, many "in use" cases are so fact specific that the tests do not lend themselves to easy application, and instead the cases sometimes appear to be decided on an ad hoc basis. See, e.g., McGrath v. Consol. Rail Corp., 136 F.3d 838, 842 (1998) (holding train "in use" while idling on a yard track); Horbin v. Providence & Worcester R.R. Co., 352 F.Supp.2d 116, 121-22 (D. Mass. 2005) (holding locomotive was still "in use" while being shut down for the

-18-

night); Haworth v. Burlington N. and Santa Fe Ry. Co., 281 F.Supp.2d 1207, 1212 (E.D. Wash 2003) (holding train "in use" during its final pre-departure inspection where it was neither being serviced nor repaired); cf Crockett v. Long Island R.R., 65 F.3d 274, 277 (2nd Cir. 1995) (holding train not "in use" when being cleaned on "out of service" track); Pinkham v. Main Cent. R.R. Co., 874 F.2d 875, 881-82 (1st Cir. 1989) (holding locomotive was not "in use" when maintenance worker was injured after completing his repairs and the locomotive was not ready to be immediately returned to service).

None of the foregoing cases, however, have focused on the effect of blue flagging (or in this case, blue lighting) a locomotive or train. The blue flag is widely recognized throughout the railroad industry as a signal, warning crews not to move locomotives in the surrounding area. Carder v. Indiana Harbor Belt R.R., 205 F.Supp.2d 981, 985 (N.D.Ind. 2002). In fact, blue flagging is mandated as part of the regulations of the Federal Railroad Administration's Railroad Operating Procedures, 49 C.F.R. §§ 218.21 et seq. In pertinent part, the regulations provide that when railroad employees are "engaged in the inspection, testing, repair and servicing of [locomotives]," and they are working "on, under or between [locomotives] on track other than the main track," the locomotive must be blue flagged. 49 C.F.R. §§ 218.21, 218.27(e). Furthermore, once blue flags or blue lights have been placed, the locomotive cannot be moved or repositioned until the flags or lights have been removed and other workers on the affected track notified. 49 C.F.R. §§ 218.23, 218.29.

The decisions in the few cases that have addressed the issue of blue flagging are mixed. Only one case, Angell v. Chesapeake & Ohio Ry. Co., 618 F.2d 260 (4th Cir. 1980), has held that a locomotive was "in use" despite the presence of blue flags. Angell involved a machinist for the railroad who was injured while working on an engine that had been placed on a service track and blue flagged. Id. at 261. The injury occurred as petitioner was attempting to uncouple two engines after all

servicing, maintenance, and inspections had been completed.  Id.  The court held that even though the engine was still blue flagged and was not scheduled to depart until several hours later,  it was being "readied" to pull a train and was thus "in use."  Id.

In contrast, the court in Paul v. Genesee & Wyoming Indus., Inc., 93 F.Supp.2d 310 (W.D.N.Y. 2000) held that a train was not "in use" when petitioner was injured while conducting a pre-departure inspection because the train was located on an assembly track that was blue flagged and locked-out.  Id. at 317.  Unlike the case at hand, however, the plaintiff in Paul was not a member of the train crew and the train was not scheduled for imminent departure.

Then in Carder, the court held that a blue flagged engine was not "in use"  when an electrician was injured while making repairs on the engine.  Although the court held that blue flagging was a significant factor in its ruling, that factor alone was not dispositive.  Instead, the court applied the same two-step analysis as in Deans, taking into account other factors, and in particular  the activity of the petitioner at the time of the injury.  Carder, 205 F.Supp.2d at 985-86.

Notwithstanding the rationales of these cases, and in view of their inconsistent results, a better rule, and a better bright line rule, is that blue flagging creates a presumption that a locomotive is not "in use."  This rule not only is more deferential to the regulations that require blue flagging, but also is more faithful to the language of the statute and the plain and ordinary meaning of the word, "use."  To use a locomotive, of course, is to put it in action, to engage it for its intended purpose.  But a locomotive cannot fairly be said to be "in use" if it cannot be moved, and blue flagging, under the regulations, literally prohibits a locomotive from being moved.  Indeed, to hold for a plaintiff who is injured on blue flagged locomotive while preparing to use it -- as is the case here -- would require this Court, in effect, to rewrite the statute so that the term, "in use," would also include preparation for use.  The statute, however, must control as written.  For that reason, plaintiff, here, was not

injured while the locomotive was in use, and trial court was correct in ruling that the LIA does not apply.

Although the principal opinion arrives at the same outcome under a "totality of the circumstances" test, that test is better suited to those cases in which the locomotive in question was not blue flagged, for it may well be that in those cases the locomotive was nonetheless not in use.  To be sure, that is the kind of case in which the totality of the circumstances test was fashioned.  See <u>Deans v. CSX Transp. Inc.</u>, 152 F.3d 326 (4th Cir. 1998).  But when a locomotive is in fact blue flagged, that circumstance should be dispositive.  Thus, I would affirm the district court's dismissal of the LIA claim on this separate ground.

_____