Argued and submitted December 22, 2015; judgment on claims 2 through 6 reversed and remanded, otherwise affirmed June 7, 2017

Jerald C. HUNTSINGER,
*Plaintiff-Appellant,*

*v.*

BNSF RAILWAY COMPANY,
*Defendant-Respondent.*

Multnomah County Circuit Court
120911791; A156588

398 P3d 403

Cody Hoesly argued the cause for appellant. With him on the briefs was Larkins Vacura LLP.

Wendy M. Margolis argued the cause for respondent. With her on the brief was Cosgrave Vergeer Kester LLP.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## GARRETT, J.

Plaintiff, a railroad employee, was injured when he fell from defendant's locomotive while preparing a train for departure. He brought negligence claims against defendant under the Federal Employers' Liability Act (FELA), 45 USC §§ 51-60, basing five of his claims on violations of the Locomotive Inspection Act (LIA), 49 USC §§ 20701-20703, and associated federal regulations. The trial court granted summary judgment to defendant on plaintiff's LIA claims, concluding that the LIA was inapplicable because, at the time of plaintiff's injury, the locomotive was not "in use." On appeal, plaintiff assigns error to that ruling, arguing that, at the time of his injuries, the locomotive was "in use" within the meaning of the LIA. We conclude that the trial court erred in granting summary judgment to defendant because, viewing the summary judgment record in the light most favorable to plaintiff, under the totality of the circumstances, the locomotive was "in use."[1] Accordingly, the judgment is reversed and remanded with respect to claims 2 through 6 and is otherwise affirmed.

We review the trial court's grant of summary judgment for legal error. *Johnson v. State Board of Higher Education*, 272 Or App 710, 714, 358 P3d 307, *rev den*, 358 Or 527 (2015). Summary judgment is proper when there are no genuine issues of material fact, and the moving party is entitled to prevail as a matter of law.[2] ORCP 47 C. Generally, in reviewing the trial court's grant of summary judgment, we view the facts in the light most favorable to plaintiff, the nonmoving party, and we draw all reasonable factual inferences in his favor. *Morehouse v. Haynes*, 350 Or 318, 321, 253 P3d 1068 (2011). In this case, the parties agreed for purposes of defendant's summary judgment motion that the

---

[1] We note that plaintiff did not file a cross-motion for summary judgment, so whether plaintiff would have been entitled to partial summary judgment had he moved for it is not before us. We decide only whether, viewing the summary judgment record in the light most favorable to plaintiff, the locomotive was "in use."

[2] We apply federal substantive law and Oregon procedural law to federal claims brought in state court. *Geris v. Burlington Northern, Inc.*, 277 Or 381, 383, 561 P2d 174 (1977).

facts are undisputed. *See Towe v. Sacagawea, Inc.*, 357 Or 74, 95-96, 347 P3d 766 (2015) (viewing the undisputed facts in the light most favorable to the nonmoving party).

Because the relevant facts on appeal concern the condition of a train and one of its locomotives at the time of plaintiff's injury, we recount the circumstances surrounding the injury in some detail. Plaintiff was employed by defendant as a "carman," meaning that he specialized in the inspection, maintenance, and repair of railcars, and, like other carmen employed by defendant, he was not authorized or qualified to work on locomotives. Defendant's locomotive department—consisting of machinists, hostlers, and electricians—was responsible for performing work on locomotives. Plaintiff was not a member of a transportation crew (*i.e.*, the engineer and other workers who travel with the train).

On the evening of plaintiff's injury, he was working on a train as part of a two-person, outbound-inspection crew in the Terminal 6 rail yard (the T-6 yard) in Portland. Nominally, the T-6 yard is a "storage yard," but most of the traffic in the yard is from grain trains travelling to and from the nearby Rivergate terminal. Loaded grain trains travel from the east through the T-6 yard to the Rivergate terminal; after a train is unloaded, a crew typically brings the train back to the T-6 yard for routine inspection and maintenance before the train returns east. Defendant uses storage tracks in the T-6 yard as departure tracks for grain trains.

Because the T-6 yard lacks a designated repair facility, locomotives or railcars needing repairs or maintenance are sent to a dedicated repair facility in Vancouver, Washington. However, if a locomotive needs only "light work or servicing," defendant's locomotive department performs such work at the T-6 yard. Typically, defendant's locomotive department completes all necessary servicing and repairs on a locomotive before it is coupled to an outbound train for departure. Locomotive 4574, the lead locomotive for the train to which plaintiff was assigned, received an inspection at the Vancouver facility the night before plaintiff was injured.

Before a train departs from the T-6 yard, the train's transportation crew arms electronic devices known as the "FRED" and "Mary." The FRED is a flashing device affixed to the rear of a train; the Mary is a small box located inside the lead locomotive. Together, the two devices monitor the air pressure in the train's air brake system and relay that information between the front and the back of the train.

The train to which plaintiff was assigned was a grain train that was set out on two tracks but otherwise fully assembled, as the tracks were too short to hold the entire train during its predeparture preparations. On the evening of plaintiff's injury, he and a crewmate were inspecting cars, performing an "air test" on the train's brake lines, and arming the FRED and Mary (typically, the train's tra nsportation crew arms the FRED and Mary, but any qualified person can do so). Plaintiff entered Locomotive 4574 to arm the Mary and observed that the device was not working. He then exited the locomotive and moved on to other inspection tasks in order to give the Mary time to start working properly. When he returned, the Mary was still not operative. In the course of removing the Mary to switch it with a replacement, plaintiff fell from the locomotive and suffered injuries to his elbow, arm, and wrist.

At the time of plaintiff's injury, the train was "blue flagged." Blue-flagging is a safety measure used to indicate that workers are in, under, or around a train. *See* 49 CFR § 218.23(a) (providing that "blue signals" signify that "workers are on, under, or between rolling equipment," and, in general, rolling equipment "may not be moved" when it is blue-flagged). According to federal regulations, the carmen who blue-flagged the train were the only workers permitted to remove the blue flag, and they were not permitted to do so until they had completed their work.[3]

When plaintiff was injured, a "handful" of cars had yet to be inspected. Locomotive 4574 was idling in order "to pump air into the air brake lines to build pressure in

---

[3] *See* 49 CFR § 218.23(b) ("Blue signals must be displayed in accordance with [§§] 218.25, 218.27, or 218.29 by each craft or group of workers prior to their going on, under, or between rolling equipment and may be only be removed by the same craft or group that displayed them.").

the train's air braking system." The train in question, as is typical of grain trains departing the T-6 yard, did not have a scheduled departure time. However, it was considered a "high priority train," meaning that "departure from the T-6 yard is imminent" once the FRED and Mary are armed. As part of their preparation of the train, the trainmaster had asked plaintiff and his crewmate to "pull down the air" for one section of railcars, which refers to the task of disconnecting the train's air brake system from the air compressors in the rail yard. Ordinarily, once workers have "pull[ed] down the air," the train departs soon thereafter because, if too much time passes, the train must be subjected to additional brake tests.

At the time of plaintiff's injury, there was no transportation crew for the train on site, and no crewmembers had been called to report to the yard to depart with the train that evening. The train was still on the yard tracks and had not been moved onto the main line. The train departed the T-6 yard at 5:30 a.m., approximately 13 hours after plaintiff had started his inspection.

Following the accident, plaintiff brought a damages action against defendant under the FELA, a federal statute that provides a private right of action to railroad workers who sustain on-the-job injuries as a result of their employer's negligence. 45 USC § 51; *Norfolk S. Ry. Co. v. Sorrell*, 549 US 158, 165, 127 S Ct 799, 166 L Ed 2d 638 (2007). Plaintiff based five of his claims on the LIA and corresponding regulations, the violation of which establishes a rail carrier's negligence as a matter of law for purposes of a FELA action. *See Urie v. Thompson*, 337 US 163, 188-89, 69 S Ct 1018, 93 L Ed 1282 (1949) (so stating with respect to the LIA's predecessor statute, the Boiler Inspection Act (BIA), *former* 45 USC §§ 23-34 (1946), *repealed by* Pub L 103-272, § 7(b), 108 Stat 1379 (1994)).[4]

A rail worker may rely upon an LIA violation to establish his employer's negligence as a matter of law only

---

[4] When appropriate, we rely on case law applying the BIA and the LIA interchangeably. *See Kurns v. R.R. Friction Products Corp.*, 565 US 625, 629, 132 S Ct 1261 (2012) (describing the process by which the BIA as amended "became commonly known as" the LIA).

if the injury-causing locomotive was "in use" at the time of the injury.[5] *See* 49 USC § 20701 (providing, in relevant part, that a "railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances" are, among other things, "in proper condition and safe to operate without unnecessary danger of personal injury"); *Wright v. Ark. & Mo. R.R. Co.*, 574 F3d 612, 620 (8th Cir 2009); *McGrath v. Consol. Rail Corp.*, 136 F3d 838, 842 (1st Cir 1998); *Crockett v. Long Island R.R.*, 65 F3d 274, 277 (2d Cir 1995).[6]

Defendant moved for partial summary judgment on plaintiff's five LIA claims, arguing that the LIA is inapplicable because the locomotive was not "in use" at the time of plaintiff's injury. For purposes of defendant's motion, the parties agreed that the material facts were undisputed, and that whether the locomotive was "in use" presented an issue of law for the court to decide. The trial court agreed with defendant that the locomotive was not "in use," granted defendant's summary judgment motion, and dismissed plaintiff's LIA claims.[7]

The sole issue on appeal is whether the trial court erred in its conclusion that the LIA is inapplicable because the locomotive was not "in use" at the time of plaintiff's injury, thereby precluding plaintiff from relying on the LIA to establish defendant's negligence as a matter of law under the FELA. We have not previously had an occasion

---

[5] For the sake of simplicity, we adhere to the shorthand phrase "in use," which has been adopted by the majority of federal courts, *see, e.g.*, *Wright v. Ark. & Mo. R.R. Co.*, 574 F3d 612, 620 (8th Cir 2009), even though that phrasing is not found in the LIA, *see* 49 USC § 20701 ("may use or allow to be used").

[6] 49 USC § 20701 provides, in its entirety:

"A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

"(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

"(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

"(3) can withstand every test prescribed by the Secretary under this chapter."

[7] Plaintiff tried his remaining FELA claim to a jury, and the jury returned a verdict in favor of defendant.

to address the proper application of the LIA's "in use" test. In this case, the relevant historical facts are undisputed, and we review the question of whether the locomotive was "in use" at the time of the injury as a question of law. *See Deans v. CSX Transp., Inc.*, 152 F3d 326, 329 (4th Cir 1998); *Angell v. Chesapeake & Ohio Ry. Co.*, 618 F2d 260, 262 (4th Cir 1980).[8] Accordingly, we review the trial court's determination that the locomotive was not "in use" for legal error. *See Minihan v. Stiglich*, 258 Or App 839, 861, 311 P3d 922 (2013) (reviewing the trial court's resolution of a question of law for legal error).

We first address plaintiff's argument that the United States Supreme Court's decision in *Brady v. Terminal Railroad Association*, 303 US 10, 58 S Ct 426, 82 L Ed 614 (1938), established a bright-line rule that, to be considered *not* "in use," a rail vehicle must have been removed from service and "reached a place of repair." We are bound by the Court's construction of federal statutes, *Industra/Matrix Joint Venture v. Pope & Talbot*, 200 Or App 248, 256, 113 P3d 961 (2005), *aff'd*, 341 Or 321, 142 P3d 1044 (2006), and, therefore, if such a bright-line test exists, our inquiry would end because it is undisputed that the train in this case was not in a dedicated place of repair. Defendant argues, however, that *Brady* does not go so far as plaintiff suggests. We agree with defendant.

---

[8] Federal courts generally characterize the "in use" inquiry as a question of law for the court, *see, e.g., McGrath*, 136 F3d at 842; *Crockett*, 65 F3d at 277, although some characterize the issue as one of law only when the historical facts are undisputed, *see, e.g., Deans*, 152 F3d at 329; *Angell*, 618 F2d at 262. Whether the "in use" inquiry presents an issue of fact or an issue of law is a procedural question on which we are not bound by federal cases that have treated it as the latter. *See Geris*, 277 Or at 383 ("In cases arising under federal law, such as the [FELA] ***, state courts are bound to follow federal substantive law but are free to follow their own practices as to matters which are strictly procedural."); *Shropshire v. Laidlaw Transit, Inc.*, 550 F3d 570, 574 (6th Cir 2008), *cert den*, 558 US 822 (2009) (describing the allocation of decision-making authority between judge and jury as "a quintessentially procedural determination" (citing *Byrd v. Blue Ridge Rural Elec. Coop.*, 356 US 525, 538, 78 S Ct 893, 2 L Ed 2d 953 (1958))). On appeal, plaintiff argues that the "in use" determination is a question of fact, but he concedes that he did not make that argument below. Indeed, the parties agreed below that the question is one of law, and the trial court treated it as such. Accordingly, for purposes of this case, we assume, without deciding, that whether a train is "in use" for purposes of the LIA is a question of law for the court.

In *Brady*, a case arising under the Safety Appliance Act (SAA),[9] the plaintiff worked as a railcar inspector. 303 US at 11. The plaintiff was injured while inspecting one car in a string of cars placed upon a "receiving" track in a rail yard. *Id.* The Court held that the car was "in use" for purposes of the statute:

> "The statute gives no ground for holding that it was the intent of Congress that in a situation such as is here presented neither [of the defendants] should be subject to the statutory duty. The use, movement or hauling of the defective car, within the meaning of the statute, had not ended when petitioner sustained his injuries. The car had been brought into the yard at Granite City and placed on a receiving track temporarily pending the continuance of transportation. If not found to be defective, it would proceed to [its] destination; if found defective, it would be subject to removal for repairs. *It is not a case where a defective car has reached a place of repair. The car in this instance had not been withdrawn from use.* The car was still in use, though motionless. In view of that use, either [of the defendants] was subject to the obligation imposed by the statute."

*Id.* at 13 (emphasis added; internal quotation marks and citations omitted). Based on the italicized language, plaintiff argues that *Brady* establishes a bright-line rule that a locomotive or other rail vehicle is "in use" *unless* it has "reached a place of repair."

---

[9] The Safety Appliance Act (SAA), formerly codified as 45 USC sections 1 through 43a, regulates the use of rail vehicles, including "car[s], locomotive[s], tender[s], or similar vehicle[s]," 49 USC § 20301, and, in some circumstances, assembled trains, 49 USC § 20302(a)(5). The SAA, like the LIA, applies only when a rail vehicle is "in use," and, for that reason, courts sometimes rely on cases applying the "in use" requirement for both statutes interchangeably. *See, e.g., Holfester v. Long Island R.R. Co.*, 360 F2d 369, 373 (2d Cir 1966). However, because the SAA also applies to assembled trains, cases analyzing whether a train was "in use" under the SAA may have limited application when assessing whether an individual rail vehicle (such as a locomotive) was "in use." *See United States v. Erie R.R.*, 237 US 402, 407, 32 S Ct 621, 59 L Ed 1019 (1915) (observing that distinct statutory requirements apply to trains and to individual cars under the SAA because "[i]n one a train is the unit and in the other a car"); *Underhill v. CSX Transp., Inc.*, No 1:05-CV-196-TS, 2006 WL 1128619 at *4-5 (ND Ind Apr 24, 2006) (declining to consider factors only relevant to whether a train is "in use" when determining whether a rail vehicle is "in use" for purposes of the SAA); *Babin v. New Orleans Pub. Belt R.R. Comm'n*, No CIV A 12-1868, 2013 WL 1856067 at *3 (ED La May 1, 2013) ("[U]nder the LIA, it is not the status of the train, but the status of the *locomotive* that matters.").

We do not interpret that language in such absolute terms. The Court did not, in its abbreviated analysis, rely exclusively on the fact that the railcar was not in a "place of repair" to conclude that it was "in use." Rather, the court also considered the fact that the car would depart immediately if it passed inspection and that it was en route to its destination. Thus, *Brady* suggests that the "in use" analysis turns on the totality of the circumstances, with consideration for such factors as the rail vehicle's location at the time of the injury (including whether it was in a "place of repair"), whether the vehicle was in the midst of a journey, and the nature of the activity being performed upon or with the vehicle.

That is, in fact, how most courts approach the "in use" inquiry, although some courts focus primarily on the location of the rail vehicle at the time of the accident and the activity in which the injured party was engaged. *See, e.g.,* *Wright,* 574 F3d at 621 (concluding that the proper analysis turns on "the totality of circumstances at the time of the injury"); *Deans,* 152 F3d at 329 ("[T]o determine whether a train is 'in use' * * *, the primary factors we consider are where the train was located at the time of the accident and the activity of the injured party."); *McGrath,* 136 F3d at 842 (stating that "the determinative factors" are the "location of the locomotive at the time of the injury and the activity of the injured party"); *Crockett,* 65 F3d at 277-78 (considering the totality of circumstances, including the fact that the train at issue was inactive on a yard track awaiting cleaning, the locomotive was not idling, the train was not being readied for imminent departure, and the plaintiff was the only employee working on the train); *Davis v. Burlington N. Santa Fe Ry. Co.,* 2016 IL App (3d) 150464, ¶ 20, 59 NE3d 820, 827 (2016) ("[C]ourts are to apply a totality-of-the-circumstances, multifactor analysis in determining whether a particular locomotive was 'in use' at the time of an injury."). *But see Trinidad v. Southern Pac. Trans. Co.,* 949 F2d 187, 189 (5th Cir 1991) (concluding that the SAA does not apply to a rail vehicle until the train has been "released following inspection," unless the vehicle has "passed inspection" before being coupled to the train). Thus, consistently with the majority of courts that have addressed the "in use" issue,

we conclude that the proper analysis looks to the totality of circumstances and does not depend upon the application of a bright-line rule.

*Brady* establishes several other principles that are pertinent to our analysis. For one, *Brady* stands for the proposition that a rail vehicle need not be in motion to be considered "in use." *See Brady,* 303 US at 13; *Deans,* 152 F3d at 330 ("A train may be considered 'in use' even though it is motionless and not yet on the main track."). Second, *Brady* establishes that a rail vehicle or train undergoing inspection may still qualify as "in use," at the very least in situations in which the vehicle would immediately move into service if it passed inspection. *See Brady,* 303 US at 16 (reasoning that "one is not to be denied the benefit of the Act because his work was that of inspection for the purpose of discovering defects"); *Wright,* 574 F3d at 621 (*"Brady* * * * demonstrate[s] that undergoing inspection, without more, is probably insufficient to establish that a train is not in use."); *Holfester,* 360 F2d at 373 (liability under the BIA does not depend on "the position the employee may be in, or the work which he may be doing at the moment when he is injured").

*Brady* does not, however, make clear how courts are to determine the point at which a railroad carrier becomes liable for an injury caused by defects in a locomotive that has not yet commenced its journey. On that point, we find the Fourth Circuit's decision in *Angell* to be instructive. In that case, at the time of the plaintiff's injury, "all servicing, maintenance, and inspection work had already been performed" on the locomotive, and it "was being moved to its place in the consist."[10] 618 F2d at 262. The Fourth Circuit found no error in the trial court's conclusion that the locomotive was "in use" at the time of the plaintiff's injury. *Id.* at 260-61. The court observed that "Congressional intent and the case law construing the [LIA] clearly exclude those injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility," but, according to the court, it was unclear at what point a railroad carrier becomes absolutely liable for injuries caused

---

[10] As used in *Angell,* the "consist" refers to an assembly of locomotives assigned to pull a train. 618 F2d at 261.

by defective equipment once "those excluded activities have been performed." *Id.* at 262 (footnote omitted). The court rejected an analysis that would completely exclude from coverage those injuries that occur "between servicing and preparing the [locomotive] up until the time the engineer takes the controls." *Id.* Instead, the court concluded that the point at which a railroad becomes liable under the LIA is the point at which a locomotive has been "made ready" for its journey—in other words, when the inspection, repair, and servicing of the locomotive are complete. *Id.* Applying that rule, the *Angell* court reasoned that, because the plaintiff was moving the locomotive in order for it to pull a train, it was proper to infer that the locomotive "was not in need of further repair or servicing and, in reality, had been 'okayed' by railway officials for service as contemplated by the [LIA]." *Id.*

Following *Angell,* other courts have applied the principle that a rail vehicle assigned to an outbound train that has not completed predeparture inspection may nevertheless be considered "in use" if that particular *vehicle* is otherwise ready to move into service. *See, e.g., McGrath,* 136 F3d at 842 (locomotive was "in use" because it was "running on the yard track and ready to move into service," despite the fact that some pre-departure inspection tasks "incidental to the task of operating the train" were not complete (brackets and internal quotation marks omitted)); *Deans,* 152 F3d at 329-30 (rail vehicle was "in use" even though pre-departure inspections had not been completed because the train "already had its engine coupled to it and was standing on a track in the rail yard in preparation for imminent departure"); *Rivera v. Union Pac. R.R. Co.,* 868 F Supp 294, 300-01 (D Colo 1994) (locomotive was "in use" when its engineer was performing predeparture inspections because the rail carrier's service department had already "completed its maintenance, repair, and servicing of the locomotive," and the locomotive was ready for "immediate use," as evidenced by the fact that it was coupled to railcars and idling); *Balough v. Northeast Ill. Reg'l Commuter R.R. Corp.,* 409 Ill App 3d 750, 766, 950 NE2d 680, 698 (2011) ("If the train or [locomotive] has been serviced and is being moved or is ready to be moved to the main line[,] it is 'in use,' even if

not all inspections have been completed."); *see also Edwards v. CSX Transp. Inc.*, 821 F3d 758, 762 (6th Cir 2016) ("[A] locomotive is 'in use' almost any time it is not stopped for repair.").

We agree with the foregoing cases that the focus of the "in use" inquiry must be to determine whether, in effect, the railroad carrier had released into a service a locomotive that it has deemed to be "in proper condition and safe to operate," *see* 49 USC § 20701, regardless of whether further predeparture activities were required before the train as a whole was ready to depart. That understanding of the "in use" inquiry is consistent with the purpose of the LIA, which is to broadly protect railroad workers from the use of rail equipment that poses an "unnecessary peril to life or limb." *Urie*, 337 US at 191 (internal quotation marks omitted); *see also Lilly v. Grand Trunk W. R. Co.*, 317 US 481, 486, 63 S Ct 347, 87 L Ed 411 (1943) (the LIA is to be "liberally construed in light of its prime purpose, the protection of employees and others by requiring the use of safe equipment"). It is also consistent with the purpose behind the "in use" limitation, which is to "give[] the railroad an opportunity to remedy hazardous conditions before strict liability attaches to claims made by injured workers." *See Wright*, 574 F3d at 620; *Wilson v. Union Pac. R.R. Co.*, 509 SW3d 862, 870 (Mo Ct App 2017) ("The purpose of [the 'in use'] limitation is to encourage and allow railroad companies to take defective locomotives out of service for inspection and repairs by relieving them of strict liability for defects in those engines while they are being serviced." (Internal quotation marks omitted.)).

We therefore conclude that, when a railroad carrier's customary processes for preparing an outbound locomotive for departure are complete, and the locomotive will not undergo further comprehensive inspections, it is appropriate to regard the railroad carrier as having allowed the locomotive to be put "in use." That is so even when other portions of the train to which the locomotive is assigned are still undergoing comprehensive inspection, because such inspections are not directed at detecting hazardous conditions in the locomotive itself. *See Babin v. New Orleans Pub. Belt R.R.*

*Comm'n*, No CIV A 12-1868, 2013 WL 1856067 at *5 (ED La May 1, 2013) (reasoning that "it is irrelevant that the *train* was still being inspected and had not yet been released," and "[w]hat is relevant is that the *locomotive* had already been inspected and okayed a[t] the time of plaintiff's accident" (emphases added)); *cf. Maynard v. Norfolk & W. Ry. Co.*, 51 F3d 267 (Table), 1995 WL 131363 at *1 (4th Cir 1995) (concluding that a locomotive was not "in use" at the time of an engineer's injury because the engineer had a duty to inspect the locomotive for defects, and he had not yet commenced that inspection at the time of his injury).

Turning to the summary judgment record in this case, we conclude that the trial court erred in its conclusion that Locomotive 4574 was not "in use" because, viewing the record in the light most favorable to plaintiff, defendant's customary processes for detecting and repairing defects in Locomotive 4574 were complete, and defendant had deemed Locomotive 4574 ready to move into service. One can reasonably infer that defendant's locomotive department had finished any work that it was going to perform on Locomotive 4574 because the vehicle was coupled to a train that was being readied for departure, and, in general, defendant's locomotive department at the T-6 yard completed all servicing, repair, and maintenance on a locomotive before it was allowed to be coupled to railcars. One can also reasonably infer that, once plaintiff's work was complete, the train would have been ready for departure because plaintiff was instructed to disconnect the train from "yard air," and, when plaintiff was injured, he was engaged in arming the FRED and Mary, one of the final tasks to be completed before the train's departure. Moreover, the tasks in which plaintiff was engaged were concerned with the train as a whole rather than the locomotive, and we agree with the reasoning of other courts, discussed above, that have focused the inquiry on the condition of the locomotive itself. In short, under the totality of circumstances, including reasonable inferences drawn in plaintiff's favor, Locomotive 4574 was "in use."

We disagree with defendant's contention that plaintiff's act of replacing the Mary in Locomotive 4574 had the effect of taking the locomotive out of service because plaintiff was performing a repair task at the time he was injured.

The record suggests that arming the FRED and Mary is a predeparture task directed at the train's air brake system as a whole, and it is not a task intended to discover defects or hazardous conditions particular to the locomotive itself. That can be inferred from the fact that a worker need not have specialized expertise with respect to locomotives in order to arm the devices, and plaintiff himself was not authorized to inspect or work on locomotives. Thus, plaintiff's attempt to replace the defective Mary does not undermine the reasonable inference that defendant had already deemed Locomotive 4574 ready for service.

In arguing that the locomotive was not "in use," defendant also relies heavily on the fact that the train had no scheduled departure time, the train did not depart until 13 hours after plaintiff and his crewmate started inspecting the railcars, and there was no transportation crew on site. We do not dispute that the imminence of a train's departure has some bearing on the "in use" analysis because a train's imminent departure supports an inference that its component parts have been approved for use. However, in this case, the passage of time between plaintiff's injury and the train's departure does not undermine a conclusion that Locomotive 4574 was "in use." The fact that the train did not have a scheduled departure time tells us little about whether Locomotive 4574 was "in use," as the grain trains departing from the T-6 yard generally do not have set departure times. Thus, with respect to the imminence of the train's departure, it is more significant that the locomotive was already coupled to cars and that it was part of an assembled train that was preparing to depart.[11] Further, although a significant amount of time passed between the start of plaintiff's work and the train's departure, we think it is more relevant that, once plaintiff completed the tasks to which he was assigned, the train would have been ready to depart, supporting an inference that Locomotive 4574 had been approved for use. Defendant does not point to any evidence

---

[11] We do not think it particularly significant that the train was in two pieces at the time of plaintiff's injury. That situation was apparently necessitated by the size of the yard tracks that defendant chose to use for the train's assembly and inspection, and it does not undermine the reasonable inference that the *locomotive* was ready for departure.

showing that this train's departure process was unusual in any respect, and therefore, we do not give the passage of time between inspection and departure much weight. Similarly, without more information about how soon before departure a transportation crew typically arrives on site, the fact that the crew had not yet arrived when plaintiff was injured does little to inform our analysis about whether the locomotive was ready for departure. Our role in reviewing the grant of summary judgment is not to draw inferences in defendant's favor, and defendant has not pointed to contextual evidence that would render the absence of an on-site transportation crew conclusive.

Finally, the fact that the train was "blue-flagged" at the time of plaintiff's injury does not undermine a conclusion that the locomotive was "in use." Blue flags are required whenever rail workers are working "on, under, or between rolling equipment," 49 CFR § 218.23(a), and therefore, the presence of blue flags is not necessarily an indication that the *locomotive* had been withdrawn from use or was otherwise being repaired or serviced. The circumstances relevant to the "in use" analysis include whether the comprehensive inspection, maintenance, and repair of an outbound locomotive was complete; whether the locomotive would be ready to depart once it passed predeparture inspection; and whether the injured worker was engaged in tasks directed at detecting and repairing defects to the locomotive. The fact that the *train* was not permitted to move at the precise time that plaintiff was injured has little bearing on those considerations.

Accordingly, viewing the record in the light most favorable to plaintiff, we conclude that the trial court erred in its conclusion that the locomotive was not "in use" when plaintiff was injured. Thus, the trial court erred in granting summary judgment to defendant.

Judgment on claims 2 through 6 reversed and remanded; otherwise affirmed.